**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 5, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

COLIN GONZALES,

    Petitioner-Appellant,

v.

    No. 06-2034

LAWRENCE TAFOYA, Warden,

    Respondent-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV 02-396 WJ/KBM)**

Margaret A. Katze, Assistant Federal Public Defender, Albuquerque, New Mexico, for the Petitioner-Appellant.

M. Victoria Wilson, Assistant Attorney General, State of New Mexico (Patricia A. Madrid, Attorney General of New Mexico, with her on the brief), Albuquerque, New Mexico, for the Respondent-Appellee.

Before **HENRY**, Chief Judge, **ANDERSON** and **GORSUCH**, Circuit Judges.

**HENRY,** Chief Judge.

Colin Gonzales pleaded guilty in New Mexico state court to committing second-degree murder, aggravated burglary, aggravated battery, and aggravated assault when he was fourteen years old. In determining an appropriate sentence, the state trial court applied N.M. Stat. Ann. § 32A-2-20 (1978, as amended through 1996), which allowed a juvenile who has committed certain serious crimes to be sentenced as an adult if "(1) the child is not amenable to treatment or rehabilitation as a child in available facilities" and (2) "the child is not eligible for commitment to an institution for the developmentally disordered or mentally disabled." The court found that Mr. Gonzales was amenable to neither treatment nor rehabilitation and was not eligible for the statutory commitment. It subsequently sentenced him to a total of twenty-two years' incarceration in an adult prison.

After the New Mexico Court of Appeals affirmed his convictions and sentences, see State v. Gonzales, 24 P.3d 776 (N.M. App. 2001), and the state trial and appellate courts summarily denied Mr. Gonzales's requests for post-conviction relief, Mr. Gonzales timely filed a 28 U.S.C. § 2254 habeas corpus petition in the district court. As in the state court proceedings, he alleged that (1) the state trial court violated his rights under the Due Process Clause of the Fourteenth Amendment by finding that he was neither amenable to treatment nor eligible for commitment without submitting those questions to a jury pursuant to Apprendi v New Jersey, 530 U.S. 466 (2000); (2) his guilty plea was not knowing

2

and voluntary; (3) he received ineffective assistance of counsel, and (4) the evidence was insufficient to support the state trial court's findings regarding amenability to treatment and eligibility for commitment. The district court assigned the case to a magistrate judge, who issued proposed findings and a recommended disposition in a thorough and well-reasoned 107-page decision. The district court adopted the magistrate judge's decision and denied all of Mr. Gonzales's claims.

For the reasons set forth below, we agree with the district court's decision. Although Apprendi holds that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," 530 U.S. at 490, the Supreme Court's decision did not involve a proceeding to determine whether a juvenile should be sentenced as an adult. As to those proceedings, Supreme Court precedent not addressed in Apprendi supports the view that neither Mr. Gonzales's amenability to treatment nor eligibility for commitment need be determined by a jury. See Kent v. United States, 383 U.S. 541, 561-62 (1966). Accordingly, applying the deferential standard of review required by the Antiterrorism and Effective Death Penalty Act (AEDPA), see 28 U.S.C. § 2254(d)(1), we conclude that the district court did not unreasonably apply federal law in rejecting Mr. Gonzales's Apprendi claim. We also agree with the district

3

court's rejection of Mr. Gonzales's claims challenging his guilty plea, his counsel's performance, and the sufficiency of the evidence.

## I. FACTUAL BACKGROUND

Most of the relevant facts are not disputed. We begin by describing the offenses committed by Mr. Gonzales, his mental health history, and the New Mexico juvenile justice system. We then summarize the state and federal proceedings below.

### A. The murder and the accompanying crimes

On March 13, 1997, Mr. Gonzales and another youth broke into the Trujillo, New Mexico home of Arsenio Lucero and his wife while they were away. The two juveniles shot the Luceros' dog with a rifle that they had stolen from another house. While Mr. Gonzales and his accomplice were still there, Mr. Lucero and his wife returned home. After Mr. Lucero entered the house, Mr. Gonzales shot him in the chest. The accomplice then shot him in the head "to put him out of his misery," 24 P.3d at 779, and Mr. Lucero died at the scene.

When Mrs. Lucero entered the house, she saw her husband's body and begged the two youths not to kill her. One of them told her to give them money and the keys to the family's truck or they would kill her too. Mrs. Lucero responded that she had neither money nor the keys. Mr. Gonzales and his accomplice then searched Mr. Lucero's body and found the keys, and Mrs. Lucero fled. The youths fired eighteen to twenty-two shots toward Mrs. Lucero and

4

several neighbors, injuring one of them.  The two then drove away in the Luceros' truck, and New Mexico state police arrested them the next day.

### B.  Mr. Gonzales's  Mental Health History

Mr. Gonzales's  mental health history soon became a central issue in the court proceedings.  His family had a history of mental illness, including attention deficit disorder, bipolar illness, and depression.  From a very early age, by some accounts as young as two, Mr. Gonzales had taken medication for impulsivity, distractibility, and learning difficulties.  His parents reported that he had fallen and hit his head twice as a young infant.

In elementary school, Mr. Gonzales had difficulty with math and spelling, as well as with tasks involving motor coordination and dexterity.  However, he learned to read and had no difficulties in doing so.  According to his mother, when the medication was properly adjusted, Mr. Gonzales made A's and B's, but his grades would drop when he either did not take medication or developed a tolerance for the dosage.

When Mr. Gonzales reached adolescence, he began abusing drugs —drinking alcohol, "huffing paint[,]" smoking marijuana, and experimenting with cocaine and LSD.  See State Ct. Rec. vol. I, at 59 (Forensic Evaluation Rpt. by Susan Cave, Ph.D.).  He also exhibited many other behavioral problems: fighting, running away, vandalizing, and stealing.  During sixth grade, school officials placed Mr. Gonzales in special education classes for "difficulties related to

attention and behavioral control." Fed. Dist. Ct. Rec. vol. III, doc. 65, at 29 (Proposed Findings and Recommended Disposition, filed Nov. 8, 2005) (citation omitted).

In July 1996, a treating physician diagnosed Mr. Gonzales with attention deficit/hyperactivity disorder and referred him to the Las Vegas Medical Center for psychiatric treatment. A psychiatrist there added diagnoses of dysthymia, a non-specific learning disorder, and a writing disorder. Within a few months, one of Mr. Gonzales's therapists, Ms. Sande Harley-Grano, became concerned that Mr. Gonzales's behavior was becoming increasingly dangerous to himself and his family. In an October 1996 letter, written to justify a residential placement for Mr. Gonzales, Ms. Harley-Grano discussed his substance abuse and his self-destructive behavior (stabbing himself with pencils and being highly provocative with dangerous peers). Ms. Harley-Grano also reported that, in March 1996, Mr. Gonzales had ransacked a house and stolen several items of property, including a gun, and that, in August of that year, he had been arrested by the police for breaking into a neighbor's home.

Despite this assessment, Mr. Gonzales's family declined the recommended residential placement. However, in January 1997, the family followed the recommendation of a juvenile probation officer and placed Mr. Gonzales in another psychiatric facility. Unfortunately, Mr. Gonzales stayed at that facility for only thirteen days. At his mother's request, but against medical advice, he was

6

discharged on February 2, 1997 with a diagnosis of "inhalant abuse, marijuana abuse, major depression, rule out Bipolar Disorder, ADHD, and history of head injury." State Ct. Rec. vol, I, at 59. (Forensic Evaluation Rpt. by Susan Cave, Ph.D.). Less than six weeks later, Mr. Gonzales shot Mr. Lucero.

### C. New Mexico's Youthful Offender Disposition Statute

Under New Mexico law, the district court for each county includes a division known as "the Children's Court." N.M. Stat. Ann. § 32A-1-5 (1978, as amended through 1993). Each district must designate one or more of its judges to serve on that court. Unlike the majority of jurisdictions, which authorize juvenile courts to transfer certain cases to an adult court, New Mexico does not have a transfer system. See Gonzales, 24 P.3d at 781-82 (discussing legislative reforms); Daniel M. Vannella, Note, Let the Jury do the Waive: How Apprendi v. New Jersey Applies to Juvenile Transfer Proceedings, 48 WM. & MARY L. REV. 723, 753 (2006) (observing that the "New Mexico legislature had created a unique juvenile transfer system"). Instead, with limited exceptions, juveniles are tried in the Children's Court, and that court is vested with authority to impose both juvenile and adult sentences in various circumstances. See Gonzales, 24 P.3d at 781-82.

New Mexico law creates three classes of juvenile offenders: serious youthful offenders, youthful offenders, and delinquent offenders. See N.M. Stat. Ann. § 32A-2-3(C), (H), (I) (1978, as amended through 1996) (provisions in effect

7

when Mr. Gonzales was prosecuted and sentenced). "These classifications reflect the rehabilitative purpose of the Delinquency Act [N.M. Stat. § 32A-2-1, et seq.], coupled with the realization that some juvenile offenders cannot be rehabilitated given the limited resources and jurisdiction of the juvenile justice system." Gonzales, 24 P.3d at 781-82.

"Serious youthful offenders" are children fifteen years or older charged with committing first-degree murder. See N.M. Stat. Ann. § 32A-2-3(H) (1978, as amended through 1996). They are excluded from the jurisdiction of the children's court unless found guilty of a lesser offense.

"Youthful offenders" are children fourteen years or older who are adjudicated guilty of any one of twelve enumerated violent felonies or who have had three prior felony adjudications in the previous three years in addition to their current felony offense, as well as children fourteen years of age who are adjudicated guilty of first-degree murder. See Gonzales, 24 P.3d at 782. "For these offenders, the determination of amenability to rehabilitation within the juvenile system is a more complicated question." Id. "Youthful offenders" are entitled to be sentenced within the juvenile system unless the prosecution has filed a notice of intent to seek an adult sentence, see § 32A-2-3(I), and the court makes certain findings regarding their amenability to treatment and eligibility for commitment. See § 32A-2-20(B). As we discuss below, this is the category to which Mr. Gonzales belongs.

8

Finally, there are juvenile offenders who do not fit into these first two categories. They include all children under the age of fourteen, and children over the age of fourteen years who have not committed certain offenses. See Gonzales, 24 P.3d at 782 (discussing N.M. Stat. § 32A-2-3(C)). "Given a delinquent child's young age or lack of a serious criminal history, the Legislature has determined that existing services and facilities most likely can rehabilitate these children within the time available." Id.

With regard to Mr. Gonzales's class–youthful offenders–the Children's Court may impose an adult sentence if the judge finds both that "(1) the child is not amenable to treatment or rehabilitation as a child in available facilities, and (b) the child is not eligible for commitment to an institution for the developmentally disabled or mentally disordered." N.M. Stat. Ann. § 32-A-2-20(B) (1978, as amended through 1996) (emphasis added) (provision in effect when Mr. Gonzales was prosecuted and sentenced). In making these findings, the court is required to consider the following factors:

> (1) the seriousness of the alleged offense;
> (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
> (3) whether a firearm was used to commit the alleged offense;
> (4) whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted;
> (5) the sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living;
> (6) the record and previous history of the child;

9

(7) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities currently available; and
(8) any other relevant factor, provided that factor is stated on the record.

N. M. Stat. § 32A-2-20(C).

### D. Initial state court proceedings

Mr. Gonzales was fourteen at the time of the murder and accompanying crimes. Three days after his arrest, the state filed a delinquency petition, charging him with eleven delinquent acts (including murder, aggravated burglary, armed robbery, and conspiracy). See Fed. Dist. Ct. Rec, vol. III, doc. 65, at 32 n.32 (listing delinquent acts). The state also filed a notice of intent to request an adult sentence.

The day of the preliminary hearing, Mr. Gonzales's counsel, a contract attorney with the state public defender, requested a confidential forensic evaluation by New Mexico's Children, Youth, and Families Department because "[i]nformation exists that leads defense counsel to question [his] mental condition and competency to stand trial in that the child has a prolonged history of mental health treatment for a presently existing mental illness." State Ct. Rec. vol. I, at 26-27. The court entered a stipulated order permitting the evaluation and suspending further proceedings until the competency issue was resolved.

In April 1997, the parties reported to the court that Mr. Gonzales was in need of assessment and treatment. As a result, the court entered an order

10

transferring him to the Sequoyah Adolescent Treatment Center, where he remained for nineteen months. On August 1, 1997, Mr. Gonzales reported that, about a month after being admitted, an older boy forced him to engage in sexual acts.

In September 1997, Mr. Gonzales retained an attorney named Dan Cron, and the public defender's office withdrew from the case. Mr. Cron began plea negotiations with the prosecutor. According to Mr. Cron's affidavit, he discussed with Mr. Gonzales the legal rights waived by a plea, the elements of the charged offenses, and the possible juvenile and adult sentences. Mr. Gonzales would generally respond that he understood. However, based on subsequent conversations, Mr. Cron concluded that his client had actually understood little of what was discussed, and so he repeated the same explanations to him.

In July 1998, Mr. Cron and the prosecutor stipulated to an amended order directing Dr. Susan Cave, a psychologist, to perform a competency evaluation. Dr. Cave interviewed Mr. Gonzales, administered a series of psychological tests, and reviewed clinical records from the Sequoyah Adolescent Treatment Unit. In an August 1998 report, Dr. Cave acknowledged that "[t]here is no adequate competency examination instrument for use with adolescents." State Ct. Rec. vol. I, at 61. In her view, Mr. Gonzales was "still incredibly emotionally immature for a boy of 15 and very self-centered[,]" nevertheless "[he] indicated sufficient information to be competent to stand trial." Id. at 62-63. Dr. Cave explained:

11

[Mr. Gonzales] can correctly identify where all the principals in a court room sit. He fully understands the function of the judge, [and he] even voluntarily explained the difference between a court trial and a jury trial. He understands that the job of the jury is to decide if you are "guilty" or "not guilty." He understands that the purpose of his lawyer is to "get me out of this with the least amount of trouble as possible." He understands that the District Attorney wants to put him in prison. He understands that the witnesses "testify against you, say what they saw." He can recite the somewhat lengthy list of charges against him. He can discuss the various levels of murder [,] and [he] comprehends them. He is able to work with his lawyer in a rational and factual manner in his own defense. He indicates that there are some things about the crime spree that week that he does not remember, but there are other things he says that "are carved into my memory." He says that when he first came to treatment, he would sit in a room and dwell on what happened. He understands the difference between juvenile sanctions and adult sanctions.

Id. at 62.

In 1998, the trial court appointed another attorney, Gerald Baca, to assist with Mr. Gonzales's defense. Mr. Baca continued the plea negotiations and recommended to his client that he not go to trial. In Mr. Baca's view, the prosecution's evidence was strong: several witnesses (Mrs. Lucero and her neighbors) had seen Mr. Gonzales leave the Luceros' house and fire a rifle at them. Moreover, Mr. Cron's investigation had ruled out the possibility that the accomplice was the only trigger man. Mr. Baca also concluded that, no matter who fired the shots, Mr. Gonzales could be convicted of the charged offenses as an accessory.

Mr. Baca concluded that Mr. Gonzales understood the legal proceedings. In Mr. Baca's view, Mr. Gonzales "appeared to be a fairly normal guy. Sure, he had

12

troubles, he had problems he had to work on.  But he was talking with me normally. He appeared to be comprehending our conversations." Fed. Dist. Ct. Rec. vol. III, doc. 65, at 42 (quoting Baca deposition).  Mr. Gonzales asked him "some fairly sophisticated questions about his defense." Id.

On October 23, 1998, the state trial judge entered a stipulated order finding Mr. Gonzales competent to stand trial.

### E.  Mr. Gonzales's guilty plea

On the same day, Mr. Gonzales and the government entered into a written agreement under which he would plead guilty to the following offenses: (1) second-degree murder (including a one-year firearm enhancement), in violation of N.M. Stat. §§ 30-2-1B and 31-18-16; (2) aggravated residential burglary, in violation of N.M. Stat. § 30-16-4; (3) aggravated battery with a firearm, in violation of N.M. Stat. §§ 30-3-5(C) and 31-18-16(A); and (4) two counts of aggravated assault, in violation of N.M. Stat. §§ 30-3-2(A) and 31-16-16(A).  The parties further agreed that, upon the court's acceptance of the plea, Mr. Gonzales would be adjudicated a youthful offender under New Mexico law.  The court would then conduct an amenability hearing within a reasonable amount of time and "[a]ll sentencing/disposition [would] be left in the [c]ourt's discretion." State Ct. Rec. vol. I, at 75.  The prosecutor, Mr. Baca, and Mr. Gonzales all signed the agreement.

As to each count, the agreement informed Mr. Gonzales of the maximum sentence that he could receive if he were sentenced as an adult (fifteen years for second-degree murder, nine years for aggravated residential burglary, three years for aggravated battery with a firearm, and eighteen months for each of the aggravated assault with a firearm charges, in addition to fines and mandatory periods of parole). The agreement further explained that if he were sentenced as a juvenile, Mr. Gonzales could receive sentences ranging from probation to a maximum of two years at the New Mexico Boy's School or an extended commitment until he turned twenty-one. Finally, the agreement informed Mr. Gonzales of his state law right to a jury or bench trial;[1] his right to compel the attendance of witnesses, and his right to confront the witnesses against him. The agreement included a certification from Mr. Baca that he had conferred with Mr. Gonzales and had explained its contents in detail.

On October 23, 1998, the court also conducted a plea hearing. The judge asked Mr. Gonzales if he understood the charges, the possible sentences he could receive (as a juvenile or as an adult), his right to a jury or bench trial, the government's burden to prove the charges beyond a reasonable doubt, his right to

---

[1] The New Mexico Supreme Court has ruled that if he or she is charged with a crime that is a felony if committed by an adult, a juvenile is entitled under the New Mexico Constitution to a jury trial during the guilt phase of the proceedings. See Peyton v. Nord, 437 P.2d 716, 726-27 (N.M. 1968). The New Mexico legislature has codified that right in a statute. See N.M. Stat. § 32A-2-16(A). However, that state-law right does not extend to amenability and commitment determinations. See Gonzales, 24 P.3d at 784-85.

14

remain silent, and his right to an attorney. After Mr. Gonzales responded that he understood those rights, the judge asked him if he admitted committing the offenses listed in the plea agreement, and Mr. Gonzales responded affirmatively. He reported that no one had threatened him or promised him anything not set forth in the plea agreement and that he was sure that he wanted to plead guilty. The judge then accepted Mr. Gonzales's plea.

### F. Amenability and Commitment Findings

Following the entry of the guilty plea, the state court held an amenability hearing pursuant to N.M. Stat. § 32A-2-20. The prosecution argued that Mr. Gonzales should be sentenced as an adult. It presented testimony from Mr. Lucero's family, police officers who were at the crime scene, officers involved in the investigation, and from Mr. Gonzales himself (through statements that he had made to police officers about the crimes). Additionally, the prosecution entered into the record a copy of a report prepared by Mr. Ray Garley, a probation officer with the Juvenile Justice Division of the New Mexico Children, Youth and Families Department. In that report, Mr. Garley recommended that the court find that Mr. Gonzales was neither amenable to treatment nor eligible for commitment.

In response, Mr. Gonzales argued that he should be sentenced as a juvenile. Mr. Gonzales focused on factors (5) (sophistication and maturity) and (7) ("the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the child by the use of procedures, services and facilities

15

currently available"). See id. § 32A-2-20(C)(5) & (7). He called four experts to testify regarding his mental health, developmental status, and prior and ongoing treatment. Although they differed with regard to a specific diagnoses, each of the experts concluded that Mr. Gonzales was amenable to treatment as a juvenile in certain facilities.

The trial court announced its ruling at a May 3, 1999 hearing. Although acknowledging that "this is a tough case . . . and I've waivered back and forth some . . . throughout," Fed. Dist. Ct. Rec. vol. III doc. 65, at 77 (quoting May 3, 1999 Hr'g, tape 3), it disagreed with Mr. Gonzales's experts. The court concluded that Mr. Gonzales was neither amenable to treatment as a juvenile in available facilities nor eligible for commitment in an institution for the developmentally disabled or the mentally disordered.

The court explained that the first five factors listed in § 32A-2-20(C) supported the government's argument for an adult sentence: Mr. Gonzales had committed a serious offense against a person with a firearm and in an aggressive, violent, premeditated, or willful manner. See § 32A-2-20(C)(1)-(4). Although he was not "totally mature[,]" "[Mr. Gonzales was not] a baby either"; "[h]e knew what was going on[;] [h]e knew what his problems were." Fed. Dist. Ct. Rec. vol. III, doc. 65, at 75 (quoting May 3, 1999 Hr'g, tape 3). Finally, the court explained, Mr Gonzales had a record of misconduct as a juvenile. As to that factor, the court referred specifically to Probation Officer Garley's report.

16

At a subsequent hearing, the trial court imposed adult sentences totaling twenty-two years.

### G. New Mexico Court of Appeals Decision on Direct Appeal

On direct appeal, Mr. Gonzales argued that New Mexico had violated his due process rights under the Fourteenth Amendment by allowing a judge rather than a jury to make findings regarding amenability to treatment and eligibility for commitment that justified the imposition of an adult sentence. Mr. Gonzales contended that these amenability and eligibility findings constituted "fact[s] that increase[] the penalty for a crime beyond the prescribed statutory maximum." Apprendi, 530 U.S. at 490. As a result, he maintained that pursuant to the Supreme Court's decision in Apprendi, those "facts" must be "submitted to a jury, and proved beyond a reasonable doubt." Id. Mr. Gonzales also argued that the evidence was insufficient to support the state trial court's findings regarding his amenability to treatment and eligibility for commitment, as well as a state law issue that is not before us.

The Court of Appeals rejected both arguments. As to the Apprendi claim, the court reasoned that the findings addressed in the Supreme Court's landmark case concerned the elements of a crime, a matter fundamentally different than findings regarding amenability to treatment and eligibility for treatment. See 24 P.3d at 783-85. The Court of Appeals further concluded that substantial evidence

17

supported the trial court's findings as to both Mr. Gonzales's amenability to treatment and his eligibility for commitment.

## H.  Federal  Habeas Proceedings

In his federal habeas corpus petition, Mr. Gonzales raised the Apprendi and sufficiency of the evidence claims.  He also asserted that his guilty plea was not knowing and voluntary and that he received ineffective assistance of counsel.

The federal district court noted that Mr. Gonzales had not exhausted the latter two claims, and it allowed him to do so.  Accordingly, Mr. Gonzales filed post-conviction actions in New Mexico state court raising the guilty plea and ineffective assistance claims.  The state court denied those claims in a summary ruling.

Following the state court's ruling, the magistrate judge issued proposed findings and a recommended disposition applying AEDPA's deferential standard of review and rejecting all of Mr. Gonzales's  claims.  The magistrate judge also denied Mr. Gonzales's  request for an evidentiary hearing, reasoning that the issues could be fully and fairly resolved on the state court record.  The district court adopted the magistrate judge's recommendation.

## II.  DISCUSSION

On appeal, Mr. Gonzales challenged the district court's decision as to each of his claims and requested a certificate of appealability.  See 28 U.S.C. § 2253(c).

18

In a prior order, this court granted that request. Here, we first summarize the standard of review under AEDPA and then proceed to the analysis of each claim.

## A. Standard of Review

Because Mr. Gonzales challenges the New Mexico state courts' legal conclusions as to the merits of the four claims now at issue, we apply AEDPA's deferential standard of review. Johnson v. Mullin, 505 F.3d 1128, 1134 (10th Cir. 2007). Under that standard, he is entitled to habeas corpus relief only if the state court's decision is "contrary to" or "an unreasonable application of" clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different" and "mutually opposed" to the Supreme Court decision itself. Id. at 406 (internal quotation marks omitted).

19

A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. In light of AEDPA, a petitioner is not entitled to relief merely because a federal court concluded in its independent judgment that the state court has applied federal law erroneously or incorrectly. See McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). Instead, the state court's application of federal law must be objectively unreasonable. Lockyer v. Andrade, 538 U.S. 63, 75 (2001). "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007) (internal quotation marks omitted).

## B. Apprendi Claims

Mr. Gonzales contends that the state courts violated his due process rights by (1) allowing a judge rather than a jury to find that he was neither amenable to treatment nor eligible for commitment; and (2) failing to determine a generally applicable standard of proof.

### 1. Judicial findings

#### a. Apprendi's holding

Mr. Gonzales's arguments are based on the Supreme Court's decision in Apprendi, 530 U.S. at 474-497. There, after the defendant pleaded guilty to state weapons charges, a New Jersey state court judge conducted an evidentiary hearing

20

and found by a preponderance of evidence that the crimes were motivated by racial bias. In light of those findings, the judge applied the state's hate crimes statute to enhance the defendant's sentence above the maximum term that could have otherwise been imposed.

In the Supreme Court's view, that judge-imposed enhancement constituted "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system" and therefore violated the defendant's due process rights. Id. The Court explained, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Id. at 490. In applying that standard, "the relevant inquiry is one not of form, but of effect–does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Id. at 494.

Mr. Gonzales maintains that the amenability and commitment findings are analogous to the New Jersey hate crimes statute applied to enhance the defendant's sentence in Apprendi: absent those findings, the maximum sentence that Mr. Gonzales could have received was commitment to a juvenile facility until he turned twenty-one. See Gonzales, 24 P.3d at 782 (discussing N.M. Stat. § 32A-2-20(B) & (E) and stating that "[u]nder the Delinquency Act, youthful offenders are entitled to be sentenced within the juvenile system unless the court makes the findings required by Section 32A-2-20-B"). However, if the state trial judge found that Mr. Gonzales was neither amenable to treatment or eligible for

21

commitment, then the court was authorized to sentence him as an adult and to therefore impose a maximum sentence of thirty-four years' imprisonment. Thus, Mr. Gonzales concludes, the effect of the judge's nonamenability-to-treatment and ineligibility-for-commitment findings was far more profound than findings held to violate the Due Process Clause in Apprendi.

In considering Mr. Gonzales's arguments, we are mindful that, when the New Mexico Court of Appeals issued its decision on direct appeal, the United States Supreme Court had not yet issued its post-Apprendi sentencing decisions in United States v. Booker, 543 U.S. 220 (2005); Blakely v. Washington, 542 U.S. 296 (2004); and Ring v. Arizona, 536 U.S. 584 (2002). As Mr. Gonzales acknowledges, those post-Apprendi decisions may not be retroactively applied on habeas review. See Schriro v. Summerlin, 542 U.S. 348, 358 (2004) (holding that Ring is not retroactive); United States v. Bellamy, 411 F.3d 1182, 1184 (10th Cir. 2005) (holding that Booker is not retroactive); United States v. Price, 400 F.3d 844, 849 (10th Cir. 2005) (holding that Blakely is not retroactive). Thus, in analyzing the New Mexico Court of Appeals's decision, we must focus on the state of federal law as of the date that the Supreme Court announce its decision in Apprendi.[2]

---

[2] We note that a colorable argument exists that Mr. Gonzales waived his right to assert the argument that Apprendi required a jury to find the facts pertaining to amenability. In his plea admission proceeding, all of the sentencing options, including the possibility of being sentenced as an adult on each count were recited. Mr. Gonzales then specifically gave up "any and all motions, defenses,

(continued...)

In our view, Mr. Gonzales's arguments have support in some of the language in Apprendi itself: there is no dispute that the amenability and commitment findings authorized the judge to impose a maximum adult sentence considerably longer than if he had sentenced Mr. Gonzales as a juvenile. Cf. State v. Kalmakoff, 122 P.3d 224, 226 (Alaska Ct. App. 2005) (observing that "[a state judge's] finding that [the defendant] was not amenable to treatment as a juvenile . . . greatly increased the maximum sentence which [the defendant] faced"), cert. denied, 127 S. Ct. 404 (2007). Indeed, in describing similar decisions in a variety of states, one scholar has written that the "[w]aiver of juveniles to criminal court for adult prosecution represents the single most important sentencing decision that juvenile court judges make." Barry C. Feld , The Constitutional Tension Between Apprendi and McKeiver: Sentence Enhancements Based On Delinquency Convictions and the Quality of Justice in Juvenile Courts, 38 WAKE FOREST L.

---

[2](...continued)
objections or requests . . . to the Court's entry of Disposition against him and imposition of sentence upon him consistent with this agreement." State Ct. Rec. vol. I, at 74; see also id. at 75 ("All sentencing/disposition shall be left in the Court's discretion."). In Blakely, the Court clarified that "nothing prevents a defendant from waiving his Apprendi rights. When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding." 542 U.S. at 310 (citing Apprendi, 530 U.S. at 488). To the extent that this language merely clarifies Apprendi's holding, it cannot be that the opposite (that one cannot consent to judicial factfinding) was clearly established federal law. Nonetheless, such a waiver argument has not been pursued. The Respondents-Appellees chose to litigate the merits of Mr. Gonzales's Apprendi claims. Like the state courts and the federal district court before us, we honor this strategy and reach the merits of Mr. Gonzales's Apprendi arguments.

REV. 1111, 1214 (2003); see also id. at 1216 ("Because juvenile waiver is a form of sentencing decision that represents a choice between the punitive sentences in criminal courts and the shorter, nominally rehabilitative dispositions available to juvenile courts, it increases the maximum penalties that juveniles face.")

However, Apprendi did not involve judicial findings that a juvenile should be prosecuted as an adult. Therefore the key question is whether its language regarding "fact[s] that increase[] the penalty for a crime beyond the prescribed statutory maximum," 530 U.S. at 490, applies to such findings.

## b. Contrasting views of Apprendi's application

On that issue, reasonable minds have differed. In Commonwealth v. Quincy Q., 753 N.E.2d 781, 789 (Mass. 2001), overruled on other grounds by Commonwealth v. King, 834 N.E.2d 1175, 1201 n.28 (Mass. 2005), the Massachusetts Supreme Judicial Court applied Apprendi to a statute that "authorize[d] judges to increase the punishment for juveniles convicted of certain offenses beyond the statutory maximum otherwise permitted for juveniles" if certain findings were made.[3] The court concluded that the findings necessary to impose the higher sentence were analogous to the findings in Apprendi. Even

---

[3]  The required findings were: "(1) the alleged offense was committed while the individual was between the ages of fourteen and seventeen years; (2) if he were an adult, the offense would be punishable by imprisonment in the State prison (i.e., a felony); and (3) the individual was previously committed to the department of youth services, or the alleged offense involved certain enumerated firearms violations, or it involved 'the infliction or threat of serious bodily harm.'" Quincy Q., 753 N.E.2d at 787 (citing MASS GEN. LAWS ch. 119, § 54).

24

though "a juvenile court system, in which juveniles are given preferential treatment, is not constitutionally required[,]" "once the Legislature enacted a law providing that the maximum punishment for delinquent juveniles is commitment to the Department of Youth Services . . . for a defined time period, . . . any facts, including the requirements for youthful offender status, that would increase the penalty for such juveniles must be proved to a jury beyond a reasonable doubt." Id. at 789.

However, the majority of courts have not followed this reasoning. See generally, Vanella, 48 WM. & MARY L. REV. at 751 (observing that "[o]f the courts that have considered th[e] possibility [that Apprendi applies to decisions transferring juveniles to the adult system] . . . most have said that Apprendi does not apply"); Kalmakoff, 122 P.3d at 227 (stating that "the overwhelming weight of authority at this time concludes that Apprendi does not apply to juvenile waiver proceeding"). These courts distinguish Apprendi on the following grounds.

First, according to some of these courts, a judge's decision that a juvenile should be prosecuted as an adult concerns the court's jurisdiction, and, as a result, Apprendi does not apply. See, e.g., United States v. Miguel, 338 F.3d 995, 1004 (9th Cir. 2003) ("Apprendi does not require that a jury find the facts that allow the transfer to district court. The transfer proceeding establishes the district court's jurisdiction over a defendant."); United States v. Juvenile, 228 F.3d 987, 990 (9th Cir. 2000) (rejecting the claim that the transfer of a juvenile to an adult court increases punishment and holding that it "merely establishes a basis for district

25

court jurisdiction") (internal quotation marks omitted); People v. Beltran, 765 N.E.2d 1071, 1075-76 (Ill. App. Ct. 2002) (concluding that Apprendi does not apply to a decision to prosecute the defendant as an adult because a transfer hearing "is dispositional, not adjudicatory"); Caldwell v. Commonwealth, 133 S.W.3d 445, 452-53 (Ky. 2004) (adopting the "jurisdiction" argument); State v. Rodriguez, 71 P.3d 919, 927-28 (Ariz. Ct. App. 2003) (holding that a juvenile transfer statute "is not a sentence enhancement scheme and, therefore, does not implicate Apprendi . . . [because it] does not subject [a] juvenile to enhanced punishment; it subjects the juvenile to the adult criminal justice system"). It is only after a juvenile is transferred to the adult system, the reasoning goes, that Apprendi requires the jury to find beyond a reasonable doubt any facts increasing the maximum sentence.

Second, some courts have relied upon the differences between the juvenile and adult criminal justice systems. They reason that the Due Process Clause requires "fundamental fairness" in juvenile proceedings but that "fundamental fairness" "does not guarantee juveniles every right criminal defendants enjoy, such as the right to a jury trial." See In re Welfare of J.C.P., Jr., 716 N.W.2d 664, 668 (Minn. Ct. App. 2006) (citing McKeiver v. Pennsylvania, 403 U.S. 528, 543, 545 (1971) (plurality opinion)); see also Beltran, 765 N.E.2d at 1076 (reasoning that "although the juvenile court made findings that exposed [the defendant] to a greater sanction, [the] defendant had no due process right to have a jury make

26

those findings beyond a reasonable doubt" because "[i]t is well established that, in a juvenile proceeding, due process does not require a jury").

Third, some courts have distinguished judicial findings supporting the adult prosecution of a juvenile from the findings traditionally made by juries. For example, in this case, the New Mexico Court of Appeals reasoned that the amenability and commitment findings at issue were not measures of the juvenile's criminal culpability, were not findings of historical fact, and required expertise that juries lacked (i.e., the "foreknowledge of available facilities and the programs in them"). Gonzales, 24 P.3d at 784.

### c. Applying Apprendi to the New Mexico juvenile system

Some of this reasoning may be inapplicable to the New Mexico juvenile system. As the magistrate judge thoroughly explained, in juvenile prosecutions, New Mexico does not provide for an initial transfer proceeding at which a court decides whether the defendant will be prosecuted as an adult. Instead, in order to trigger the possible imposition of an adult sentence, the prosecution must file a notice of intent within ten days of the delinquency petition. See N.M. Stat. Ann. § 32A-2-20(A) (1978, as amended through.1996) (the provision in effect when Mr. Gonzales was prosecuted and sentenced). Then, as we have noted, the juvenile has a state law right to a jury trial in the guilt phase (although Mr. Gonzales did not exercise that right here). However, the determination regarding an adult sentence is not made until after the guilt phase of the proceeding, when the judge holds a hearing. Thus, with regard to the New Mexico procedures, one cannot say that the

27

decision regarding an adult sentence "merely establishes a basis for district court jurisdiction." See Juvenile, 228 F.3d at 990. Here, when a New Mexico court determined to sentence Mr. Gonzales as an adult, the court already had jurisdiction, and it had already adjudicated him guilty of the charged offenses. The amenability and commitment findings "greatly increased the maximum sentence which [Mr. Gonzales] faced." Kalmakoff, 122 P.3d at 226.

Similarly, the mere fact that juveniles may not have a federal constitutional right to a jury trial in delinquency proceedings, see McKeiver, 403 U.S. at 543, does not seem sufficient to distinguish Apprendi when the findings at issue authorize an adult sentence. Mr. Gonzales observes that this distinction appears to sanction "a constitutional no man's land," Reply. Br. at 7, in which a youth could be denied both the benefits of the juvenile system (i.e., limited sentences and an emphasis on rehabilitation) and the Sixth Amendment right to a jury trial afforded to adult offenders.

Nevertheless, in our view, the distinction between the kinds of findings made at the amenabilty hearing and findings traditionally made by juries is a plausible one. Under the New Mexico statute at issue, the judge must make a series of judgments, weighing a variety of factors rather than merely determining particular facts—for example, the seriousness of the offense, the sophistication and maturity of the juvenile offender, his or her record and previous history, the prospects for adequate protection of the public, and the likelihood of reasonable rehabilitation. See N.M. Stat. § 32A-2-20(C). We agree with the New Mexico

28

Court of Appeals that many of these judgments may benefit from special skills and experience and involve "a predictive, more than historical, analysis." <u>Gonzales</u>, 24 P.3d at 784. Moreover, the judge is required to evaluate contrasting testimony from mental health professionals, and in that way his task resembles that of the judge in adult civil commitment proceedings. <u>See</u> <u>id</u>. The fact that the Supreme Court has held that the beyond-a-reasonable doubt standard is inapplicable to those adult proceedings suggests that the <u>Apprendi</u> requirements are not clearly applicable here. <u>See</u> <u>id.</u> at 84-85 ("'Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous.'") (quoting <u>Addington v. Texas</u>, 441 U.S. 418, 429 (1979)).

The distinction between amenability findings and the findings addressed in <u>Apprendi</u> is also supported by scholarly opinion. In Professor Berman's view, <u>Apprendi</u>, <u>Blakely</u>, and <u>Booker</u> implicitly recognize an important constitutional distinction between "(1) finding those facts that mandate particular sentencing outcomes based on the predetermined judgments of legislatures or sentencing commission[s] (a task juries must perform), and (2) exercising reasoned judgment at sentencing based on the consideration of relevant sentencing facts (a task judges may perform)." Douglas A. Berman, <u>Conceptualizing Booker</u>, 38 ARIZ. ST. L.J. 387, 417 (2006). The latter determinations do not involve findings of historical fact (as did <u>Apprendi</u>) but instead "are akin to value judgments that judges have traditionally made when exercising reasoned judgment in the course

of selecting an appropriate sentence." Id. at 420. As a result, he concludes, the defendant's constitutional right to a jury trial is not implicated. Under the New Mexico statue, the amenability findings require similar value judgments, and Professor Berman's analysis thus supports the New Mexico Court of Appeals's reading of Apprendi. Cf. Feld, 38 WAKE FOREST L. REV. at 1221-22 (concluding that "[w]aiver [of juvenile court jurisdiction] is a quintessential sentencing decision that considers myriad individualized facts bearing on 'amenability'" and that therefore is appropriately decided by a judge rather than a jury).

To be sure, other parts of the New Mexico statute do direct the judge to consider historical facts: whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; whether a firearm was used; and whether the offense was against persons or against property. See N.M. Stat. Ann. § 32A-2-20(C)(2)- ((4)) (1978, as amended through 1996) (provision in effect when Mr. Gonzales was prosecuted and sentenced). Those facts resemble those at issue in Apprendi.

Nevertheless, Mr. Gonzales does not here contend that, in deciding to impose an adult sentence, the state court judge exceeded the scope of the guilty plea in finding those particular historical facts. As we see it, Mr. Gonzales's complaint is not that the judge found that he committed the offenses in an aggressive, violent, premeditated or willful manner, that he possessed a firearm, or that the offenses involved injuries to persons rather than property. In light of the guilty plea, there was no longer a dispute about those matters. See Blakely, 542

30

U.S. at 310 ("When a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the defendant either stipulates to the relevant facts or consents to judicial factfinding.") (citing Apprendi, 530 U.S. at 488). Instead, Mr. Gonzales's contention is that the Constitution bars the judge from making the kind of judgments implicit in assessing factors like his maturity, his potential for dangerousness, and the prospects for rehabilitation. Apprendi simply does not address those kinds of findings. In light of our deferential standard of review under AEDPA, that distinction forecloses Mr. Gonzales's claim for habeas relief.

### d. Pre-Apprendi decisions involving juvenile proceedings

We find additional support for that conclusion in the Supreme Court's pre-Apprendi decisions involving the juvenile justice system. Those cases hold that delinquency proceedings "must measure up to the essentials of due process and fair treatment." See Kent v. United States, 383 U.S. 541, 562 (1966). In the Court's view, that means that the juvenile is entitled to pre-hearing notice of the charges, the right to representation by counsel at the adjudicatory hearing, the privilege against self-incrimination, the requirement that testimony be given under oath, the opportunity for cross-examination, and the requirement that the prosecution prove the charges beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 368 (1970); In re Gault, 387 U.S.1, 31-57 (1967). However, the federal Constitution does not require a jury trial. McKeiver, 403 U.S. at 545-51.

31

In Kent, 383 U.S. at 554-565, the Court set forth the constitutional requirements for the kind of decision at issue in Mr. Gonzales's case. A District of Columbia juvenile judge had waived jurisdiction and transferred a rape case to the federal district court. Despite the "tremendous consequences" of the juvenile judge's decision (a possible death sentence for rape under the District of Columbia Criminal Code, as opposed to being kept in custody until the juvenile's twenty-first birthday), the judge had neither held a hearing nor made any findings setting forth the reasons for his decision. 383 U.S. at 554. The Supreme Court held that the juvenile had a due process and Sixth Amendment right to a hearing, a statement of the reasons for the juvenile judge's decision to transfer the case, and assistance of counsel. 383 U.S. at 557. Importantly, the Court added, "[w]e do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing." Id. at 562; see also Breed v. Jones, 421 U.S. 519, 537 (1975) (discussing Kent and stating that "the Court has never attempted to prescribe criteria for, or the nature or quantum of evidence that must support, a decision to transfer a juvenile for trial in adult court").

Thus, Mr. Gonzales's argument that the amenability findings resemble those at issue in Apprendi and must be made by a jury beyond a reasonable doubt seeks to expand the constitutional requirements for transfer hearings beyond those set forth in Kent. Because Apprendi neither cites Kent nor discusses juvenile transfer hearings at all, the New Mexico Court of Appeals plausibly declined to

32

read <u>Apprendi</u> so broadly and reasonably concluded that the earlier case was controlling.

### e. Contrasting traditions

Additionally, <u>Apprendi</u>'s holding is based upon a "historical foundation," 530 U.S. at 477, centuries of common law tradition regarding the role of the jury and the burden imposed upon the government of proving its charges beyond a reasonable doubt. In light of that tradition, the Supreme Court characterized the judicial fact finding allowed by the New Jersey hate crimes statute as a "novelty." <u>Id.</u> at 482.

The same cannot be said for juvenile transfer hearings. At common law, children seven years or older "were subjected to arrest, trial, and in theory to punishment like adult offenders." <u>In re Gault</u>, 387 U.S. at 16. Thus, a youth like Mr. Gonzales was not entitled to argue (before judge or jury) that he should receive the benefit of an alternative, more rehabilitative sentencing scheme because of his age.

Of course, the common law approach changed dramatically with the development of juvenile courts in the late nineteenth and early twentieth centuries and the Supreme Court's landmark decisions extending certain constitutional protections to proceedings in those courts. <u>See, e.g.</u>, <u>In re Winship</u>, 397 U.S. at 368; <u>In re Gault</u>, 387 U.S. at 31-57; <u>Kent</u>, 383 U.S. at 557. Even so, the Supreme Court has continued to distinguish between the liberty interests of adults and juveniles.

For example, in <u>Schall v. Martin</u>, 467 U.S. 253, 265 (1984), the Court reasoned that a juvenile's interest in freedom from institutional restraints "must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." In the Court's view, "[c]hildren, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as <u>parens patrie</u>." <u>Id.</u>

Under that analysis, when questions of Mr. Gonzales's amenability to treatment and eligibility to commitment were submitted to a judge rather than a jury, his young age distinguished him from an adult defendant entitled to a jury trial under the Sixth and Fourteenth Amendments. Unlike <u>Apprendi</u>, no "historical foundation . . . extend[ing] down the centuries into the common law" required submission of the amenability and commitment questions to "'twelve of [Mr. Gonazales's] equals and neighbours.'" <u>Apprendi</u>, 530 U.S. at 477 (quoting W. BLACKSTONE, 4 COMMENTARIES 343). The judge's exercise of the state's <u>parens patrie</u> power did not contravene that tradition.

In our view, it is also significant that forty-five states and the District of Columbia have enacted statutes allowing judges to transfer juveniles to adult court after making specified findings. Vannella, 48 WM & MARY L. REV. at 739; <u>see also</u> Feld, 38 WAKE FOREST L. REV. at 1215 ("Traditionally, most states allowed [juvenile] judges to waive jurisdiction based on a discretionary assessment of a youth's 'amenability to treatment' or 'dangerousness.'"). Although these statutes

34

set forth varying standards of proof (or none at all), "[n]o state has required a [beyond a] reasonable doubt standard before a judge may waive juvenile court jurisdiction." Vannella, 48 WM.& MARY L. REV at 740. Of course, the mere existence of these statutes does not resolve the constitutional question before us. See Schall, 467 U.S. at 268. However, these statutes do indicate that the decision whether to transfer a juvenile to the adult system has not traditionally been made by a jury.

The established practice of "legislative waiver" is also relevant. By one scholar's reckoning, twenty-nine states have enacted statutes under which juveniles of a certain age who have committed certain acts will automatically be tried in adult courts. See Vannella, 48 WM. & MARY L. REV. at 741-42. New Mexico law provides an example. Children fifteen years or older who are convicted of first-degree murder may not be sentenced as juveniles. See N.M. Stat. § 32A-2-3(H). In these instances of legislative waiver, the transfer to the adult courts is accomplished by statute, unaccompanied by factual findings by either a jury or a judge. See Kalmakoff, 122 P.3d at 227 (noting that a juvenile subject to legislative waiver "would have far fewer procedural protections, such as the right to have a lawyer represent him and the right to present evidence at a hearing in front of a judge"); Feld, 38 WAKE FOREST L. REV, at 1222 (noting the state legislatures' authority to "exclude more categories of offenses from juvenile court jurisdiction"). The prevalence of legislative waiver further demonstrates that, in contrast to the factual findings in criminal trials, which Apprendi

35

addressed, amenability and commitment findings have not traditionally been made by juries.

## 2.  Burden of Proof

Mr. Gonzales also argues that the state court proceedings failed to comport with constitutional due process requirements in another respect.  He observes that N.M. Stat. § 32A-2-20 does not specify a burden of proof for amenability hearings.  He invokes the Supreme Court's decision in Santosky v. Kramer, 455 U.S. 745  (1982).  There, the Court held that before it may terminate parental rights, the state must support its allegations by at least clear and convincing evidence.  The Court offered the following observations about specifying the burden of proof in advance:

> In [a prior case] . . .  the Court held that fundamental fairness may be maintained in parental rights termination proceedings even when some procedures are mandated only on a case-by-case basis, rather than through rules of general application.   But this Court never has approved case-by-case determination of the proper standard of proof for a given proceeding. Standards of proof, like other procedural due process rules, are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions. Since the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance. Retrospective case-by-case review cannot preserve fundamental fairness when a class of proceedings is governed by a constitutionally defective evidentiary standard.

455 U.S. at 757 (internal quotation marks, alterations, and citations omitted) (final emphasis added). According to Mr. Gonzales, this same kind of improper case-by-case determination occurred here.

Our review of the state court proceedings establishes that Mr. Gonzales's argument lacks merit. As the New Mexico Court of Appeals explained, Mr. Gonzales filed a prehearing motion requesting that the trial judge apply the beyond-a-reasonable-doubt standard to the amenability hearing. The trial court's initial ruling did not specify a burden of proof. However, at Mr. Gonzales's request, the court subsequently clarified that it had used the clear-and-convincing standard. See Gonzales, 24 P.3d at 780 (quoting the trial court's explanation that "I made my [amenability and commitment] ruling based on the clear and convincing evidence argument that you . . . made to me[, and] I still think that's the appropriate standard.").

On direct appeal, the parties argued over the correct standard of proof. Although the Court of Appeals concluded that the beyond-a-reasonable-doubt standard was not required, it declined to decide whether the proper standard was the clear-and-convincing standard adopted by the trial court or preponderance of the evidence, as argued by the prosecution. The Court of Appeals did hold that substantial evidence supported the trial court's findings by clear and convincing evidence. 24 P.3d at 787-89.

37

This procedural history demonstrates that the New Mexico courts did not engage in the kind of case-by-case approach condemned by the Supreme Court in Santosky. Unlike the circumstances to which Santosky refers, the state trial court did not use "a constitutionally defective evidentiary standard." 455 U.S. at 757. As we have reasoned above, federal law did not clearly require the beyond-a-reasonable-doubt standard at the amenability hearing, and the trial court and New Mexico Court of Appeals applied the less exacting (but still substantial) clear-and-convincing standard in assessing the evidence in this case. In our view, Santosky's observations about case-by-case review do not mean that the burden of proof must be specified in a statute, particularly when the factfinder and the appellate court both apply a constitutionally permissible standard, as they did here.

**3. Conclusion as to Apprendi claims**

We therefore conclude that the New Mexico Court of Appeals's refusal to apply Apprendi's holding to juvenile transfer proceedings is neither contrary to nor an unreasonable application of federal law. Thus, Mr. Gonzales is not entitled to relief on his claim that the state court judge violated his Due Process and Sixth Amendment rights by making findings in support of an adult sentence and by applying the clear-and-convincing burden of proof.

**C. Challenge to Guilty Plea**

Next, Mr. Gonzales challenges the state courts' finding that his guilty plea was knowing and voluntary. He invokes (a) affidavits from himself and his

mother regarding his motivation for entering the guilty plea and his mental status at the time; (b) expert testimony; (c) the diminished capacity of juveniles in general; and (d) the complexity of these particular proceedings. Mr. Gonzales further argues that the federal district court erred in refusing to grant him an evidentiary hearing on the claim.

Although the state trial court found that Mr. Gonzales's plea was knowing and voluntary, it did not make specific factual findings supporting that conclusion. Similarly, in the post-conviction proceedings, the state court issued a summary ruling and did not make factual findings regarding this claim. Accordingly, we must determine whether the state court's legal conclusion that Mr. Gonzales's plea was knowing and voluntary was contrary to or an unreasonable application of federal law. See Johnson v. Atherton, 296 F.3d 991, 993 (10th Cir. 2002) (applying the contrary to or unreasonable application of standard to a challenge to a guilty plea). As to the district court's denial of the request for an evidentiary hearing, our review is for an abuse of discretion. See Anderson v. Attorney Gen. of Kan., 425 F.3d 853, 858 (10th Cir. 2005).

**1. Applicable law**

A criminal defendant's state court guilty plea must comport with due process. Miles v. Dorsey, 61 F.3d 1459,1465-66 (10th Cir. 1995). Thus, the defendant must be competent to enter the plea and the plea must be knowing and voluntary. Allen v. Mullin, 368 F.3d 1220, 1238-39 (10th Cir. 2004) (discussing

39

competency); <u>Cunningham v. Diesslin</u>, 92 F.3d 1054, 1060 (10th Cir. 1996) (discussing the knowing and voluntary requirement).

In order to be competent to enter a guilty plea, a defendant must be able to consult with his attorney with a reasonable degree of rational understanding and must have "a rational as well as factual understanding of the proceedings against him." <u>Allen</u>, 368 F.3d at 1239 (internal quotation marks omitted). A plea is "knowing" if the defendant has "a full understanding of what the plea connotes and of its consequence." <u>Boykin v. Alabama</u>, 395 U.S. 238, 244 (1969). In order to be "voluntary," a plea must be "the product of a deliberate, intelligent choice." <u>Cunningham</u>, 92 F.3d at 1060.

In evaluating challenges to guilty pleas, courts must occasionally assess a defendant's contention that his mental illness rendered the plea invalid. Although the defendant's mental illness may be relevant to the general inquiry, it does not in itself establish that the plea violated a defendant's due process rights. <u>See</u> <u>Miles</u>, 61 F.3d at 1470-71. The same may be true of a defendant's misunderstanding of particular circumstances surrounding the plea. <u>See</u> <u>United States v. Ruiz</u>, 536 U.S. 622, 630 (2002) (stating that "the Constitution . . . does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor" and citing as examples of misapprehension that might not render a plea invalid the defendant's

erroneous assessment of the strength of the state's case and his failure to anticipate a change in the law regarding relevant punishments).

## 2.  Mr. Gonzales's  plea

Applying those standards to Mr. Gonzales's plea, we conclude, for substantially the same reasons set forth by the magistrate judge, that the state courts did not unreasonably apply federal law in accepting his plea.

First, Mr. Gonzales's competency is supported by the report of Dr. Cave, which was completed two months before he pleaded and which concluded that he "indicated sufficient information to be competent to stand trial."  State Ct. Rec. vol. I, at 62-63.  The testimony of Mr. Baca is also important.  Although he had some initial concerns about his client's ability to make rational decisions about his future, Mr. Baca explained that during his meetings with Mr. Gonzales during the six-week period before the entry of the plea, Mr. Gonzales appeared to comprehend the explanations of the proceedings and even asked some fairly sophisticated questions about his defense.

Mr. Baca's testimony also supports the state courts' conclusion that the plea was knowing and voluntary.  He and Mr. Gonzales discussed the charges and the terms of the plea agreement in some detail.  He informed his client of the rights that he would be waiving as well as the maximum sentences that he would face under the plea agreement if he was sentenced as a juvenile and if he was sentenced as an adult.  Moreover, Mr. Baca reviewed the agreement with Mr. Gonzales line

41

by line, explaining each paragraph and quizzing him on its contents. Importantly, Mr. Baca recommended the plea agreement. He told Mr. Gonzales that the evidence against him was strong and that the possible defenses (including self-defense, an alibi, or duress) were not plausible.

The written documents accompanying the plea agreement also support the state courts' rejection of Mr. Gonzales's challenge. Prior to entering the plea, Mr. Gonzales, Mr. Baca, and the state court judge reviewed and signed an "Admission Proceeding" and a "Plea and Disposition Agreement." State Ct. Rec. vol. I, at 73-76. These documents set forth the charges to which Mr. Gonzales would plead, the maximum adult and the maximum juvenile sentences as to each charge, the rights that Mr. Gonzales would waive if he pleaded guilty, and the sentencing procedures that would follow the entry of the guilty plea (i.e., that the judge would conduct an amenabilty hearing and retain discretion to sentence Mr. Gonzales as a juvenile or as an adult).

Finally, the plea colloquy supports the state courts' rejection of Mr. Gonzales's claim. The state court judge asked Mr. Gonzales if he understood the plea agreement and if he agreed with it, and Mr. Gonzales responded affirmatively. Mr. Gonzales told the judge that he understood the charges against him and the rights he would waive if he pleaded. He added that he was satisfied with the representation of Mr. Baca. Mr. Gonzales admitted the prosecution's allegations as to each count, and he stated that his admissions were voluntary, that no one had

42

threatened him, and that no one had promised him anything other that what was set forth in the "Admission Proceeding" and the "Plea and Disposition Agreement." The judge asked if Mr. Gonzales was taking any medication that interfered with his ability to understand the proceedings, and Mr. Gonzales said no. When the judge asked him if he was sure that he wanted to plead, Mr. Gonzales said "yes."

In light of the observations of Dr. Cave and Mr. Baca, the written documents signed by Mr. Gonzales, the plea colloquy, and the trial judge's findings, the specific arguments that Mr. Gonzales advances here are not persuasive. They do not undermine the state courts' conclusion that he was competent to enter his plea and that he did so knowingly and voluntarily.

In particular, the affidavits from Mr. Gonzales and his mother report that he pleaded guilty because he wanted to be released from state custody pending sentencing. Significantly, the affidavits do <u>not</u> state that anyone promised Mr. Gonzales that he would be allowed to go home if he pleaded. Moreover, such a promise would be inconsistent with Mr. Gonzales's own assurances to the judge that he had received no promises other than what was contained in the plea agreement. Those assurances "carry a strong presumption of verity," <u>Lasiter v. Thomas</u>, 89 F.3d 699, 702 (10th Cir. 1996) (internal quotation marks omitted), and state courts could properly rely upon them in rejecting Mr. Gonzales's challenges to his plea.

43

Additionally, even accepting the contention that Mr. Gonzales was motivated by a desire to be released from state custody, that motivation does not establish that his plea was not knowing and voluntary. Other than a release from custody pending sentencing, there were ample reasons to accept the plea—e.g., the strength of the prosecution's case and the significant risk of a much greater sentence if the case went to trial before a jury or a judge. Given these reasons, the record provides substantial support for the conclusion that Mr. Gonzales had "a full understanding of what the plea connote[d] and of its consequence," Boykin, 395 U.S. at 244, and constituted a deliberate, intelligent choice. Cunningham, 92 F.3d at 1060.

As to the expert testimony now invoked by Mr. Gonzales, we note that, at most, Dr. Thompson's evaluation, conducted more than five years after the guilty plea proceedings, indicates that there are some differences of opinion about Mr. Gonzales's mental health and its effect on his understanding of the proceedings. Importantly, Dr. Thompson's evaluation does not state that Mr. Gonzales was incompetent or that his plea was not knowing and voluntary. Cf. Miles, 61 F.3d at 1474 (concluding that "[p]etitioner's history of mental problems, low intelligence, psychotropic medication, and substance abuse [did] not establish that he was incompetent to plea.").

As to the diminished capacity of juveniles in general, we agree with Mr. Gonzales that the defendant's young age presents a matter of serious concern in

44

determining whether to accept a plea.  Cf.  Roper v. Simmons, 543 U.S. 551, 569-70, 578-79 (2005) (discussing juvenile defendants' more frequent "lack of maturity and an underdeveloped sense of responsibility[,]" a greater susceptibility to negative influences and outside pressures, including peer pressure, and more malleable personality traits, and holding that the execution of juveniles violates the Eighth Amendment).  However, as the magistrate judge reasoned, that concern does not mean that a juvenile is incapable of entering a knowing and voluntary plea.  The Supreme Court has concluded that the same totality of the circumstances standard applies to both juveniles and adults in determining whether they have waived their rights.  See Fare v. Michael C., 442 U.S. 707, 725 (1979).  Thus, a defendant's age, while certainly a factor in determining whether a plea is knowing and voluntary, is not dispositive.  Here, there is ample indication that the state trial court thoroughly considered Mr. Gonzales's  young age before accepting his guilty plea.  The court ordered a competency evaluation, provided Mr. Gonzales with counsel, and observed him during the plea colloquy.

Finally, the complexities presented by New Mexico's juvenile procedure do not alter our conclusion.  The fact that Mr. Gonzales was required to decide whether to plead guilty without knowing if he would be sentenced as an adult or as a juvenile may well have made the proceedings more difficult for such a young defendant to understand.  Nevertheless, the record establishes that the state court judge and Mr. Gonzales's counsel explained the process to him in considerable

45

detail, both orally and in writing, and that they reasonably concluded that he understood the New Mexico procedures.

Accordingly, we conclude that the state courts' rejection of Mr. Gonzales's challenge to his plea was neither contrary to nor an unreasonable application of federal law.

## 3. Evidentiary Hearing

In the alternative, Mr. Gonzales contends that the district court should have afforded him an evidentiary hearing so that he could further develop the factual basis for his challenge to his guilty plea. In rejecting that argument, the magistrate judge reasoned that Mr. Gonzales's claims were either contravened by the existing factual record or, even if considered true, would not entitle him to relief.

A habeas petitioner who has not failed to develop the factual basis for his claim in state court is entitled to an evidentiary hearing in federal court "so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." Anderson, 425 F.3d at 858 (internal quotation marks omitted). However, a hearing is unnecessary if a claim can be resolved on the existing record. Id.; Torres v. Mullin, 317 F.3d 1145, 1161 (10th Cir. 2003).

In light of that standard, we discern no abuse of discretion in the denial of Mr. Gonzales's request. See Anderson, 425 F.3d at 858. The record contains extensive testimony from mental health professionals, law enforcement officials,

juvenile authorities, and other witnesses familiar with Mr. Gonzales. That testimony was sufficient for the magistrate judge and the district court to throughly assess Mr. Gonzales's contentions.

## D. Ineffective Assistance of Counsel Claim

Mr. Gonzales contends that the New Mexico state courts and the federal district court erred in rejecting his Sixth Amendment claim for ineffective assistance of counsel. He cites six instances of allegedly deficient performance by the counsel that represented him at the amenability hearing: (1) failing to correct the testimony of Sonde Harley Grano, a psychotherapist who treated him and testified at the amenability hearing; (2) failing to object to the trial court's reliance on the effects of a sexual assault that occurred while he was in state custody; (3) failing to obtain a neuropsychological evaluation; (4) failing to object to the trial court's reliance on evidence of prior misbehavior that did not result in a conviction; (5) agreeing to Mr Gonzales's evaluation by the New Mexico Youth, Diagnostic, and Development Center in Albuquerque, New Mexico; and (6) failing to challenge the qualifications of Ray Garley, a New Mexico probation officer who testified that Mr. Gonzales was not amenable to treatment. Mr. Gonzales further argues that (7) he was severely prejudiced by the cumulative effect of these errors in that, if not for his counsel's mistakes, he would have been sentenced as a juvenile.

Mr. Gonzales raised his ineffective assistance of counsel claim in post-conviction proceedings in the New Mexico state courts, which denied them in summary rulings. Because the courts reached the merits of Mr. Gonzales's claims, we apply AEDPA's deferential standard of review. See Webber v. Scott, 390 F.3d 1169, 1174 (10th Cir. 2004) (noting that "[d]eference is accorded to a state court result even when the state court fails to discuss any federal law rationale for its decision or cite to any federal authority"); Brown v. Uphoff, 381 F.3d 1219, 1225 (10th Cir. 2004) ("[I]n the context of summary decisions . . . we owe deference to the state court's result.") (internal quotation marks omitted).

Like the New Mexico courts, we must examine Mr. Gonzales's claims under the well-established framework set forth in Strickland v. Washington, 466 U.S. 668 (1984), asking whether (a) his counsel's performance was constitutionally deficient, and (b) the deficient performance prejudiced the defense, depriving him of a fair proceeding with a reliable result. Snow, 474 F.3d at 719. Under the deficient performance prong, Mr. Gonzales must show that his counsel's performance "fell below an objective standard of reasonableness" in that it was outside "the range of competence demanded of attorneys in criminal cases." Id. (quoting Strickland, 466 U.S. at 687-88). Under the prejudice prong, Mr. Gonzales must show that "but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient

48

to undermine confidence in the outcome." <u>Sallahdin v. Gibson</u>, 275 F.3d 1211, 1235 (10th Cir. 2002).

Upon review of the record, we agree with the magistrate judge's analysis of Mr. Gonzales's ineffective assistance claims. On both the deficient performance and prejudice prongs, Mr. Gonzales has failed to establish that the state court's rejection of his claims was contrary to or an unreasonable application of federal law.

**1. Failing to correct the testimony of Sonde Harley-Grano,**

In announcing its findings at the amenability hearing, the trial court cited the testimony of Sonde Harley-Grano, a psychotherapist who had treated Mr. Gonzales. Ms. Harley-Grano had testified that Mr. Gonzales was amenable to treatment and eligible for commitment. However, she had qualified her opinion to some extent. She explained that the best predictor of future behavior is past behavior, that Mr. Gonzales "still carries risk with him," and that "there's nothing certain in this field." Fed. Dist. Ct. Rec. vol. III, doc. 65, at 90 (magistrate judge's proposed findings and recommended disposition) (quoting Jan. 11, 1999 Hr'g, tape 3). The trial court interpreted her testimony as follows:

> I guess really one of [the] things that made me think the most about this case was the testimony of Sonde Harley-Grano . . . . [S]he said [Mr. Gonzales] used to be dangerous and would do all kinds of crazy things. He is now passive and docile[,] and [she] doesn't think it is due to the medications he was on. She thinks he has made personality changes, but she can't be sure. . . . <u>She went on to say that</u>

49

> his potential to do something terrible is greatly reduced, but
> he is likely to do this again . . . . [I]t's her feeling that this
> is gonna happen again.

Id. at 92-93 (quoting May 3, 1999 Hr'g, tape 3) (emphasis supplied by the
magistrate judge).

Both the New Mexico Court of Appeals and the magistrate judge concluded
that the trial judge appeared to misunderstand Ms. Harley-Grano's testimony to
some extent. See Gonzales, 24 P.3d at 788; Fed. Dist. Ct. Rec. vol. III, doc. 65, at
93. Neither of them could find support in the record for the trial judge's statement
that, according to Ms. Harley-Grano, Mr. Gonzales was "likely to do this again."
Nevertheless, both of them concluded that this mischaracterization did not
undermine the trial judge's reliance on other parts of her testimony.

Mr. Gonzales now argues that his counsel was constitutionally deficient for
failing to correct the judge's misunderstanding. Like the magistrate judge, we
disagree. Even though there is no indication that Ms. Harley-Grano expressly
stated that Mr. Gonzales was "likely to do this again," the trial judge's evaluation
of her testimony, although debatable, was not unreasonable. Parts of her
testimony may be plausibly read to undermine her ultimate conclusion that Mr.
Gonzales was amenable to treatment. As a result, it was also not unreasonable for
the state courts to conclude that Mr. Gonzales's counsel's failure to object to the
trial judge's assessment of the testimony did not fall outside "the range of

50

competence demanded of attorneys in criminal cases." Strickland, 466 U.S. at 687.

Moreover, Mr. Gonzales's has failed to establish that, if not for his counsel's failure to object, there was a reasonable probability that the trial judge would have reached a different result. The New Mexico statute requires the judge to weigh a variety of factors, including not only a juvenile's prospects for rehabilitation but also the seriousness of the offense; whether it was committed in an aggressive, violent, premeditated or willful manner; whether the juvenile used a firearm; and whether the offense involved injuries to persons rather than property. See N.M. Stat. § 32-A-2-20(B). Many of these factors may be plausibly applied to the facts here to support an adult sentence. Additionally, despite the fact that other mental health experts agreed with Mr. Harley-Grano that Mr. Gonzales was amenable to treatment, the trial judge had discretion to evaluate their testimony along with the other relevant evidence and to disagree with their opinions. Thus, the state courts' rejection of this ineffective assistance claim is also not contrary to or an unreasonable application of Strickland's prejudice prong.

## 2. Failing to object to reliance on sexual assault evidence

During the amenability hearing, the court heard evidence that Mr. Gonzales had reported that he had been sexually assaulted by another juvenile and that he suffered post-traumatic stress as a result. Mr. Gonzales now contends that his counsel was constitutionally deficient in failing to object to the trial court's

51

reliance on that evidence. He cites cases holding that the state has a duty to ensure the safety of prisoners in its custody. His argument seems to be that the trial judge erred in relying upon the trauma that Mr. Gonzales had suffered as a result of the assault to support his finding of non-amenability to treatment. In his view, the state was precluded from relying on psychological difficulties caused by its own negligence in arguing for an adult sentence.

We will assume for the sake of this discussion that the sexual assault did occur. Moreover, we do not dispute the proposition that the state has a responsibility to protect those in its custody from such assaults. See Benefield v. McDowall, 241 F.3d 1267, 1270-71 (10th Cir. 2001) (stating that "[p]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners" and that "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment") (internal quotation marks omitted). Nevertheless, we are not persuaded that the failure to object to the evidence of the assault constituted ineffective assistance of counsel under the Strickland standard.

In particular, Mr. Gonzales's argument is undermined by the fact that in announcing its decision that it would sentence Mr. Gonzales as an adult, the trial court did not expressly refer to the sexual assault at all. We acknowledge that the court did refer to Ms. Harley-Grano's testimony and to Probation Officer Garley's report and that both of them discussed the sexual assault. Moreover, in discussing

52

the assault, Mr. Garley's report stated that "failing to accept and/or deal with the incident," was "not [a] characteristic[] that [is] conducive to positive growth and development." State Ct. Rec. vol. I, at 114. Nevertheless, given the broad inquiry authorized by the New Mexico statutes governing amenability hearings, it was not improper for those witnesses to discuss the assault insofar as it affected Mr. Gonzales's mental health. As a result, it was not unreasonable for the state courts to refuse to find that Mr. Gonzales's counsel was constitutionally deficient in failing to object to this evidence.

Additionally, for similar reasons, we conclude that Mr. Gonzales has failed to establish a reasonable probability of a different result if his counsel had made such an objection. Although the sexual assault may well have exacerbated Mr. Gonzales's difficulties, the record contains substantial evidence that those difficulties were serious and longstanding, even absent that incident.

### 3. Failing to seek a neurological evaluation

Mr. Gonzales argues that his counsel was deficient for failing to obtain a neuropsychological evaluation prior to his sentencing. He notes that the subsequent evaluation by Dr. Thompson (completed during the state post-conviction proceedings) revealed indications of organic brain dysfunction.

. We agree with the state that Mr. Gonzales's counsel's strategy was a reasonable one and that the failure to obtain a neuropsychological evaluation was not deficient. Mr. Gonzales's counsel offered evidence from four experts that

53

included testimony about a possible brain injury. However, the decision not to further emphasize the possible brain injury was reasonable: such an emphasis might have undermined the argument that Mr. Gonzales's mental health problems were treatable. Moreover, given the abundant mental health testimony contained in the state court record, Mr. Gonzales has failed to establish that the additional evidence provided by such an evaluation would raise a reasonable possibility that the trial judge would have sentenced him as a juvenile.

**4. Failing to object to the use of uncharged acts**

During the state court proceedings, Mr. Garley, the juvenile probation officer, wrote a report that included accounts of prior incidents of violent and anti-social behavior by Mr. Gonzales. In including this information, Mr. Garley relied on a letter written by Ms. Harley-Grano, which described some of these incidents. The trial judge referred to these incidents when he announced his findings at the amenability hearing. Mr. Gonzales now argues that these incidents involved uncharged conduct and that Mr. Gonzales's trial counsel should have objected to them, or, at the very least, argued that the court should give little weight to them.

Again, we are not persuaded that counsel's failure to object constituted deficient performance under Strickland. As the magistrate judge observed, the New Mexico statute directs the court to consider "the record and previous history of the child" as well as "any other relevant factor, provided that factor is stated on the record." N. M. Stat. § 32A-2-20(C)(6) & (8). That language is broad enough

54

to allow the court to consider the unadjudicated acts to which Mr. Gonzales now objects. Cf. United States v. Anthony Y., 172 F.3d 1249, 1253 (10th Cir. 1999) (holding that, under the federal statute governing transfers of juveniles to adult status, unadjudicated conduct "was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts' (quoting 18 U.S.C. § 5032); see also State v. Jose S.,171 P.3d 768, 772 (N.M. .Ct. App.) (resolving an ambiguity in the statutes governing amenability hearings "in favor of obtaining more information, not less, to guide the trial court in making an educated and appropriate disposition"), cert. granted, 2007 WL 4593437 (N.M. Nov. 07, 2007).

Moreover, contrary to Mr. Gonzales's  contentions, his counsel sought to minimize the significance of the unadjudicated acts.  Finally, as with Mr. Gonzales's other ineffective assistance claims, he has also failed to establish the required prejudice.

## 5.  Agreeing to an evaluation by the Youth Diagnostic and Detention Center (YDDC) in Albuquerque, New Mexico,

Mr. Gonzales argues that his counsel was constitutionally deficient in agreeing to an evaluation at YDDC.  We disagree.

During the amenability proceedings, the trial court expressed its belief that a YDDC evaluation would not be useful.   However, despite these initial views, the court eventually ordered an evaluation at YDDC.  The staff there produced a report that found Mr. Gonzales amenable to treatment and recommended placement in a juvenile facility until age twenty-one.  See State Ct. Rec. vol. I,  at 100-05.

In announcing its finding, the court again expressed its dissatisfaction with YDDC.  This time, the court expressed its disapproval of the staff's failure to consider the unadjudicated violent and antisocial behavior noted in Probation Officer Garley's report.  The court also questioned the credibility of a YDDC psychologist, who testified that the prior misconduct would not have made a difference in his diagnosis.

Like the magistrate judge, we conclude that the state courts reasonably rejected this ineffective assistance claim as well.  As the magistrate explained, the YDDC evaluation was requested by the probation officer.  Mr. Gonzales's  counsel did not agree that the evaluation was necessary, and he objected to it.  At one point, counsel did state that "if it's going to happen, it seems that YDDC should probably do it."  See Aplt's Br. at 51 (quoting Feb. 2, 1999 Hr'g at 3.49) (emphasis added).  However, at most that statement indicates some disagreement with the trial court about the competence of the YDDC staff.  It does not come close to establishing that counsel's performance was outside "the range of

56

competence demanded of attorneys in criminal cases." Strickland, 466 U.S. at 687. Moreover, Mr. Gonzales makes no attempt to demonstrate that counsel's allegedly deficient performance was prejudicial.

## 6. Failing to object to evaluation by Mr. Garley

Mr. Gonzales also contends that his counsel was deficient in failing to sufficiently challenge Mr. Garley's report. As we have noted, Mr. Garley disagreed with the four mental health experts who evaluated Mr. Gonzales. In his view, Mr. Gonzales was neither amenable to treatment nor eligible for commitment. See State Ct. Rec. vol. I, at 114. Mr. Garley concluded that Mr. Gonzales had failed to accept responsibility for Mr. Lucero's murder.

Like the magistrate judge, we do not agree that Mr. Gonzales failed to adequately challenge Mr. Garley's report. Counsel presented witnesses to respond to the report, including Ms. Harley-Grano. In addition, at the conclusion of the amenability hearing, counsel presented proposed findings of fact that directly challenged Mr. Garley's testimony, noting that Mr. Garley had never before written a report addressing a juvenile's amenability to treatment, that he did not have full access to voluminous treatment records, and that "Mr. Garley appears to base his opinions on a few comments allegedly made by the child, rather than upon a review of the entire history and data in this case." State Ct. Rec. vol. I, at 138. Given these efforts to rebut Mr. Garley's report, counsel's performance was not

57

deficient under <u>Strickland</u> and the state court's rejection of this claim was neither contrary to nor an unreasonable application of federal law.

## 7. Cumulative Error

Finally, Mr. Gonzales argues that he was prejudiced by the cumulative effect of his counsel's errors. Under <u>Strickland</u>, "all acts of inadequate performance may be cumulated in order to conduct the prejudice prong." <u>Gonzales v. McKune</u> 247 F.3d 1066, 1078 n.4 (10th Cir. 2001). Here, however, we have concluded that Mr. Gonzales's counsel's performance was not constitutionally deficient, and so there is no error to cumulate.

We further note that, contrary to Mr. Gonzales contentions, his counsel's performance reflects a sound and well-executed strategy. Counsel produced a series of qualified witnesses who supported the argument that a juvenile sentence was warranted. The fact that the trial court was not persuaded by counsel's arguments does not support Mr. Gonzales's challenge to their competence but rather reflects the challenging facts with which they were confronted.

## E. Sufficiency of the Evidence

Finally, Mr. Gonzales argues that the New Mexico Court of Appeals unreasonably concluded that the evidence was sufficient to warrant his sentencing as an adult. He invokes the expert testimony indicating that he was amenable to treatment as well as the testimony of one witness who stated that there were

several facilities that indicated a willingness to provide inpatient treatment for him, thereby suggesting that he was eligible for commitment.

Under the Due Process Clause, evidence is sufficient if, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements" under the appropriate standard of proof. See Dockins v. Hines, 374 F.3d 935, 939 (10th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  Because the Court of Appeals reached the merits of the sufficiency of the evidence question, we apply AEDPA's deferential standard of review.  Patton v. Mullin, 425 F.3d 788, 796 (10th Cir. 2005).  We apply a presumption of correctness to the state courts' factual findings and then determine whether the legal rulings were contrary to or an unreasonable application of federal law.  See Snow, 474 F.3d at 696. In conducting our inquiry, we defer to the state court's interpretations of state law.  See Mansfield v. Champion, 992 F.2d 1098, 1100 (10th Cir. 1993).

Here, the Court of Appeals applied several principles of New Mexico law. First, noting that the trial court had disagreed with mental health experts who found Mr. Gonzales amenable to treatment, the Court of Appeals observed that "it is well settled in New Mexico that a factfinder may disregard the opinions of experts.  Gonzales, 24 P.3d at 788 (quoting In re Ernesto M., Jr., 915 P.2d 318, 323 (N.M. App. 1996)).  Second, the Court of Appeals concluded that assessing both amenability to treatment and eligibility for commitment, the trial court was

59

required to consider the seven factors listed in N.M. Stat. § 32A-2-20(C). Gonzales, 24 P.3d at 788-89. Finally, the Court of Appeals disagreed with Mr. Gonzales that "if any expert deems the child eligible for commitment . . . or if any treatment facility is willing and able to accept the child, then the court must find the child eligible for commitment to an institution." Id. at 789. In the Court of Appeals's view, the trial court's role was "not as simple as merely tallying votes for and against commitment." Id. Instead, "[t]he trial court must observe the child, measure the credibility of witnesses, consider the security and appropriateness of available facilities, and analyze all evidence in light of the Section 32A-2-20(C) factors." Id. The relevant question is "whether [the juvenile defendant] could be successfully rehabilitated or treated for his mental illnesses given available facilities and the time remaining before [he] reach[es] the age of twenty-one." Id.

Mindful of those principles, the New Mexico Court of Appeals concluded that the evidence was sufficient to support the trial court's findings. As to amenability to treatment, the court reasoned that the evidence was not as clear as Mr. Gonzales had suggested: "the testimony indicated that he carried the risk of violence with him and that it was impossible to predict whether he would re-offend." Id. at 788. In addition, one of the experts testified that Mr. Gonzales's progress had been sporadic, and several expressed concern over his apparent lack of remorse for the murder. As to eligibility for commitment, one witness testified

60

that Mr. Gonzales's mental status would need to decline significantly before he could be committed. Others testified that while Mr. Gonzales might be eligible for some degree of residential treatment, he was eligible for neither high security residential treatment nor commitment to an institution for the developmentally disabled.

In light of the evidence and state law principles cited in the Court of Appeals opinion, we conclude that its assessment of the evidence was reasonable. Although Mr. Gonzales offered evidence to support the imposition of a juvenile sentence, considerable evidence supported the trial court's findings that Mr. Gonzales was neither amenable to treatment nor eligible for commitment.

The Court of Appeals employed the clear and convincing standard that the trial court used, and not the beyond a reasonable doubt standard generally applicable to criminal prosecutions. However, we have already concluded in rejecting Mr. Gonzales's Apprendi claim that the application of the former standard to the amenability hearing was not contrary to or an unreasonable application of federal law. We therefore agree with the district court that Mr. Gonzales is not entitled to habeas relief on this claim.

### III. CONCLUSION

This is a tragic case, both in terms of the vicious underlying crime and Mr. Gonzales's troubled health history and life style. The decision whether to prosecute Mr. Gonzales as a juvenile or as an adult was particularly difficult. As

the trial judge observed, strong arguments supported both alternatives, and the statutory factors pointed in both directions.

Nevertheless, the difficulty of that decision does not establish that Mr. Gonzales was entitled to jury at the amenability hearing. Like other states, New Mexico's juvenile justice system reflects a rehabilitative purpose and directs the decisionmaker to make an individualized assessment of the defendant with that purpose in mind. That task is suited for the particular experience and skill of a judge, and the Supreme Court's decision in <u>Apprendi</u>, which addressed findings of historical fact by juries in criminal trials, does not clearly alter that view.

New Mexico's system differs from that of many states in an important respect: the judge's decision whether the juvenile will be treated as an adult comes after an adjudication of guilt and can thus be fairly characterized as part of the sentencing decision rather than a preliminary determination as to which court has jurisdiction. However, that distinction does not render the New Mexico system constitutionally infirm. Although there are some advantages to the other approach, the states retain discretion to devise their own juvenile justice systems so long as constitutional difficulties do not arise. We hold today that New Mexico's procedures, particularly under the AEDPA standard of review, do not conflict with Supreme Court law.

Because Mr. Gonzales's other claims also lack merit, we therefore AFFIRM the district court's denial of his 28 U.S.C. § 2254 petition.

62