# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 29, 2011 Session

## BRANDON MOBLEY v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Knox County
### No. 89072    Bob R. McGee, Judge

### No. E2010-00379-CCA-R3-PC - Filed August 18, 2011

The petitioner, Brandon Mobley, appeals from the Knox County Criminal Court's denial of his petition for post-conviction relief challenging his 2005 convictions of two counts of premeditated first degree murder, especially aggravated robbery, and setting fire to personal property for which he is now serving two consecutive life sentences plus 19 years in the custody of the Department of Correction. On appeal, the petitioner contends that the post-conviction court erred by denying his petition for post-conviction relief based upon allegations that he was denied the effective assistance of counsel and other constitutional deprivations. Because we determine that the petitioner is entitled to relief on the issue of the ineffective assistance of counsel concerning the use of expert testimony, we reverse the judgment of the post-conviction court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which J.C. McLIN, J., joined. JERRY L. SMITH, J., filed a separate opinion, concurring in part and dissenting in part.

Wade V. Davies, Knoxville, Tennessee, for the appellant, Brandon Mobley.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner was convicted of especially aggravated robbery, setting fire to personal property, and two counts of premeditated first degree murder involving the victims,

Joshua Nance and Oshalique Hoffman.[1] The trial court sentenced the petitioner to two consecutive life sentences for the first degree murder convictions and to an effective sentence of 22 years for the remaining felony offenses, to be served consecutively to the life sentences. The evidence adduced at trial established that the petitioner shot the victims inside Ms. Hoffman's car on May 26, 2003. *See State v. Brandon Mobley*, No. E2006-00469-CCA-R3-CD, slip op. at 1-8 (Tenn. Crim. App., Knoxville, June 11, 2007), *perm. app. denied* (Tenn. Sept. 24, 2007). He then dumped Ms. Hoffman's body in the street before driving to a wooded area behind a church to dump Mr. Nance's body. *See id.* at 4. Afterwards, the petitioner went to the home of an ex-girlfriend, where he procured products to clean the interior of the car and enlisted the help of his ex-girlfriend's younger sister to complete the task. *See id.* at 3. The petitioner told friends he had killed the victims after Mr. Nance threatened him with a gun, telling them "that he planned on getting dope from the two victims, but Mr. Nance told him that if [he] did not 'pay up' the money he owed, his mother could pick him up at the morgue. Mr. Nance laid a gun on his lap, so the [petitioner] reacted and shot both victims." *Id.* at 4.

The petitioner sought the testimony of Doctor Pamela Auble, who "was prepared to offer her opinion that, due to the [petitioner's] mental illnesses, he would have been unable to premeditate at the time of the killings." *Id.* at 6. The State objected, arguing that the testimony would invade the province of the jury, that it was "irrelevant and immaterial," and that it related to "diminished capacity . . . which is not allowed in Tennessee." *Id.* Ultimately, the trial court agreed with the State and deemed Doctor Auble's testimony "'invasive and not allowable.'" *Id.*

Following the trial court's ruling, the petitioner took the stand and testified that he supported himself by selling drugs that he purchased from Mr. Nance and sold at a profit. *Id.* According to the petitioner, on the night before the murders, Mr. Nance telephoned him at his mother's residence to call in a $2,000 debt the petitioner owed him for cocaine Mr. Nance had "fronted" to the petitioner. *Id.* The petitioner said that Mr. Nance threatened him, and he agreed to meet Mr. Nance on the following day. He admitted arming himself before going to meet Mr. Nance because he knew Mr. Nance to be in the habit of going armed. *See id.* The petitioner walked to the appointed meeting place, and "about five minutes" later Mr. Nance and Ms. Hoffman arrived in Ms. Hoffman's car. *Id.* The petitioner testified that he was initially hesitant to get into the car but ultimately complied with Mr. Nance's demands that he get into the back seat. *See id.* The petitioner claimed that he intended to return the cocaine to Mr. Nance because he could not afford to pay the money he owed. The petitioner

---

[1] The transcripts of the post-conviction evidentiary hearing reflect the victim's name as "Haufman." The indictment and direct appeal record reflect the spelling as "Hoffman." As is the practice of this court, we will employ the spelling contained in the indictment.

explained that Mr. Nance insisted that he wanted the money and that if the petitioner did not provide it "his mother would be identifying him at the morgue." *Id.* at 7. At that point, the petitioner claimed, Mr. Nance displayed a firearm, and the petitioner shot Mr. Nance in reaction. *See id.* The petitioner testified that Ms. Hoffman ducked, and he shot her because he thought she was reaching for a weapon. *See id.* "Then, the [petitioner] panicked and laid Hoffman's body on the parking lot." *Id.* The petitioner then drove to a church, where he disposed of Mr. Nance's body by pushing it down a hill. *See id.*

The petitioner then drove to his ex-girlfriend's residence, where he cleaned up the car and met with friends. The friends then followed the petitioner to a location on Tipton Station Road, where he burned the car. *See id.* "The [petitioner] claimed he threw [Mr.] Nance's gun out the window as he was going across a bridge." *Id.* The petitioner had his friends drive him to a motel on Lovell Road, and he was arrested outside the motel a short time later. *See id.* The petitioner acknowledged telephone records showing that a call had been placed from his mother's cellular telephone to Mr. Nance on the day of the murders, but he denied making the calls, saying that the calls must have come from his mother's boyfriend, who was also buying drugs from Mr. Nance. *See id.*

Following the petitioner's testimony, the State reversed its position on Doctor Auble's testimony, and the trial court permitted her to testify as an expert. Doctor Auble testified that she interviewed the petitioner and performed a number of tests designed to assess the petitioner's mental health. *See id.* Her testing established that the petitioner had an intelligence quotient of 78, placing him in the "'borderline range of functioning.'" *Id.* The testing also established "that the [petitioner] had difficulties with attention and concentration" and that "his spelling, reading, and math skills were poor." *Id.* at 8. Personality tests showed the petitioner to be "very depressed" with a "bleak" self-view and "trouble controlling [his] emotions." *Id.* Doctor Auble testified that her review of the petitioner's medical and psychological records revealed "a chaotic life as a child," including a history of being molested by one of his mother's boyfriends. *Id.* Doctor Auble testified that her testing established that the petitioner was not malingering. *See id.*

> Specifically addressing events that led up to Memorial Day, 2003, [Doctor] Auble stated that the [petitioner] was expelled from school after an altercation, he impregnated his girlfriend, he was in a car accident, and possibly made a suicide attempt. Then, in April 2003 the [petitioner] was robbed, which made him even more distrustful and paranoid. [Doctor] Auble diagnosed the [petitioner] as having major depression, attention deficit hyperactivity disorder, oppositional defiant disorder, and low intellectual functioning. Additionally, there were a number

-3-

> of psychosocial stresses from his life experiences. In response to questioning about how the [petitioner] would have reacted to perceived threats, [Doctor] Auble further testified that the [petitioner] would be quick to perceive people as hostile. He would respond impulsively, without thinking, and this all would have affected his mental state at the time of the killings.

*Id.* Doctor Auble conceded that, during his narrative of the offenses, the petitioner told her that he shot Ms. Hoffman first because she had brandished a handgun. *See id.*

Further evidence presented at trial showed that Knoxville Police Department officers discovered Mr. Nance's body behind a church in the early morning hours on the day after Memorial Day. The police found the defendant's fingerprints on a revolver found near Ms. Hoffman's body. Forensic examination confirmed that the bullets removed from Ms. Hoffman and shell casings found at Ms. Byrge's home were fired from the revolver. The petitioner was arrested while attempting to flee a motel. *Id*. at 4-5.

Doctor Sandra Elkins, Knox County Medical Examiner, testified that both victims died from gunshot wounds to their heads. She further testified that the trajectories of the wounds were consistent with both victims being shot by someone seated in the backseat of the car. Although Ms. Hoffman died instantly, Mr. Nance may have survived up to four hours after being shot. *Id*. at 5.

On direct appeal, the petitioner challenged the sufficiency of the evidence to support his convictions, the trial court's initial exclusion of the expert testimony of Doctor Auble, and the trial court's imposition of sentences. Concluding that the evidence was sufficient and that no reversible error had occurred regarding Doctor Auble's testimony, this court affirmed the petitioner's convictions but modified the defendant's total effective sentence to two consecutive life sentences plus 19 years' incarceration. *See id*. at 1.

*Post-Conviction Proceedings*

On April 24, 2008, the petitioner filed a timely pro se post-conviction petition alleging that his convictions were the result of the ineffective assistance of counsel, prosecutorial misconduct, and other constitutional deprivations committed by the trial court. Following the appointment of counsel, the petitioner filed an amended petition alleging that his transfer from juvenile court to adult court based upon judicial fact-finding violated *Apprendi v. New. Jersey*, 530 U.S. 466 (2000), and its progeny; that his total effective sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment; that his convictions were the result of multiple specific instances of ineffective assistance of

-4-

counsel; that the trial court committed constitutional error concerning the breakdown of the attorney-client relationship; that he was denied his right to present a defense related to Doctor Auble's expert testimony; that the State withheld evidence of threats of prosecution made to one of its witnesses; and that this court applied an erroneous standard of review on direct appeal concerning the harmlessness of the exclusion of expert testimony. Subsequently, the petitioner filed a second amendment to his petition alleging several issues related to the trial court's forcing him to wear a shock belt during trial, which he contends violated his right to a fair trial.

At the November 25, 2009 evidentiary hearing, trial counsel testified concerning his representation of the petitioner. Trial counsel recalled that the petitioner did not want to "dress out" on the day of trial. After conferring with counsel, the petitioner did come to court, although he was fearful about going to trial. Trial counsel acknowledged that in the weeks leading up to trial, the petitioner had expressed his desire not to "go forward" with counsel and asked him to withdraw, but trial counsel did not file a motion to withdraw. He said that in subsequent pretrial meetings there were "no problems" and described the meetings as "productive."

Concerning the petitioner's decision to testify at trial, trial counsel said that he advised the petitioner that the petitioner was the only person who could tell what happened on the day of the offenses but that it was completely the petitioner's decision whether to testify. Trial counsel acknowledged that he did not prepare the petitioner for testifying by any sort of mock examination or outline because the "facts [of the case] were so cut and dry." Trial counsel testified that he met with the petitioner over 20 times.

Trial counsel did not recall consenting to the petitioner's wearing a shock belt, but he stated that if the transcript reflected that he had consented, then he must have done so. He said that he did not discuss the shock belt with the petitioner and that the trial court did not hold a hearing concerning the shock belt. He recalled that although the petitioner was fearful the day of trial, he was not disruptive. Trial counsel stated that he "didn't think [the shock belt] made a difference" because the device could not be seen by the jury.

Trial counsel testified that he "went over the [tele]phone records" with the petitioner and never told the petitioner that the records were inadmissible. He said that the testimony concerning the petitioner's attempt to telephone a tire store surprised him, but he found the testimony insignificant in light of the petitioner's making no attempt to sell parts from a victim's car and his setting fire to the stolen vehicle. Because the car was burned with the tire rims still on, trial counsel did not think the reference to the tire store had any relevance.

Concerning forensic evidence, trial counsel admitted that he neither interviewed any laboratory technicians nor objected to the admission of their testimony. He opined that there was no basis to object to either the serology evidence or the ballistics evidence.

Trial counsel recalled that the petitioner had "very little, if no[]" family support. He noted that the petitioner's family history was characterized by "[a] lot of history of drug abuse and everything else . . . it was bad. His living conditions were bad."

Trial counsel's strategy at trial was to convey to the jury the petitioner's version of the events, which included his claim of self-defense, as well as to convey to the jury that the petitioner's mental state precluded him from forming the requisite mens rea for the offenses. To that end, trial counsel intended to utilize the testimony of Doctor Auble, whose report contained details of the petitioner's family and mental health histories as well as his version of the events leading to the offenses. When the trial court sustained the State's objection to the admission of Doctor Auble's testimony, trial counsel said that he "was pretty well taken aback by both the objection and by [the trial court]'s initial agreement." Trial counsel explained that he had researched the admissibility of such testimony and utilized it similarly in other trials prior to the petitioner's trial. Trial counsel recalled discussing *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997) (holding that evidence negating a defendant's ability to form the culpable mental state is generally admissible) with the trial court to no avail, stating that "it didn't seem to make any difference" to the trial court.

Trial counsel recalled that the initial ruling concerning Doctor Auble affected the petitioner's decision to testify. Trial counsel believed that without Doctor Auble's testimony, the State had shown sufficient evidence of premeditation and that the petitioner had no choice but to testify to present proof of self-defense. Trial counsel recalled that the petitioner testified that he routinely carried a handgun for protection because he had been robbed recently. Trial counsel recalled that the petitioner testified that Mr. Nance brandished a pistol first and that then the petitioner panicked and shot both victims.

Trial counsel testified that the State withdrew its objection to Doctor Auble's testimony after the petitioner testified. Trial counsel said that "ultimately [Doctor Auble] was able to testify" about the petitioner's inability to premeditate. According to trial counsel, he asked Doctor Auble whether the petitioner's mental state precluded the petitioner from premeditating the offenses. He further recalled that Doctor Auble testified that the petitioner was unable to premeditate. Trial counsel acknowledged that Doctor Auble reported that the petitioner had told her that Ms. Hoffman was the person who pulled the gun, causing the petitioner to panic and shoot both victims. He claimed, however, that Doctor Auble also testified that such "small discrepancies" in the petitioner's account of the offenses would not

-6-

have changed her diagnosis concerning his ability to premeditate. Trial counsel ultimately admitted that the discrepancy concerning which victim pulled the gun was significant to the petitioner's claim of self-defense and that the petitioner most likely would not have testified had the trial court properly admitted Doctor Auble's testimony on counsel's first attempt. Trial counsel recalled that the State's closing argument referenced the discrepancy concerning who had first pulled the gun.

On cross-examination, trial counsel conceded that there was an increased concern for courtroom security at the petitioner's trial because the victims' families and the petitioner's family had had some verbal confrontations. Trial counsel also acknowledged that the petitioner had told friends different versions of the shootings and that these friends later testified as witnesses for the State. Trial counsel opined that there was never an issue whether the petitioner had committed the offenses and that the only issue was whether the offenses were committed in self-defense or without premeditation. Trial counsel said that the State's case was very strong and noted that the jury had acquitted the petitioner of two counts of felony murder.

Jada Byrge testified that she was the petitioner's girlfriend at the time of the offenses. She said that her sister, Tabitha Robinson, who was ten-years-old at the time of the offenses had helped the petitioner clean the victim's car and had seen blood and brain matter on the dashboard of the car. Ms. Byrge testified that she and her sister were hesitant to testify at trial because they felt threatened by the petitioner's siblings, some of whom attended school with Ms. Bryge. Ms. Byrge recalled that the prosecutor visited her home and told her that Tabitha could be charged as an accessory for her role in assisting the petitioner. She said that she felt threatened by the prosecutor's statement, but she also affirmed that she testified truthfully at trial.

Appellate counsel testified that, despite the petitioner's complaints concerning trial counsel and the investigator, she did not disclose to the petitioner that her husband was the investigator. She said that each time the petitioner expressed dissatisfaction with trial counsel and the investigator, she simply explained that it was "not accepted practice" to raise issues concerning counsel's performance on direct appeal. She also acknowledged that trial counsel had asked her to represent the petitioner on appeal and that she had offered a favorable opinion of trial counsel's performance to the petitioner. Appellate counsel conceded that she had no interaction with the petitioner during trial. Furthermore, her interaction with the petitioner during his appeal was limited to correspondence, and she never personally spoke to the petitioner at any time during her representation of him. She opined that it would have been deficient performance for her to raise an ineffective assistance of counsel claim on direct appeal.

-7-

Concerning the trial court's use of a shock belt on the petitioner during trial, Knox County Sheriff's Office (KCSO) Assistant Chief of Corrections William Purvis testified that he was unaware of any type of shock belt being available for use at the time of the petitioner's trial in May 2005, and he could not locate any record of one being used on the petitioner. KCSO Lieutenant James Carson testified that he was supervisor of the court service division at the time of the petitioner's trial and that, as such, any use of a restraint device required his approval after borrowing one from another division. He could not recall borrowing any such device for use on the petitioner.

KCSO Assistant Chief Harold K. Hayes testified that jail visitation logs contemporaneous to trial counsel's representation of the petitioner were destroyed in September 2009. He was not aware that a subpoena had been served on the agency in July 2009 concerning the records. He said that had he been aware of the subpoena, any records pertinent to the petitioner would have been salvaged and provided.

The petitioner testified that trial counsel was appointed to represent him after his case was transferred from juvenile court to adult court. He recalled that his first three meetings with counsel consisted of only brief discussions concerning the petitioner's desire for a bond reduction hearing. The petitioner recalled that he waited months for trial counsel to file a bond reduction motion and that none was ever filed. He said that each time he spoke with trial counsel, counsel would tell him that the motion was ready but that he had been "kind of busy." The petitioner said that he began to feel that he was being "railroaded" by trial counsel's inattention to his case. At one meeting with trial counsel and the investigator, petitioner "cursed [trial counsel] out" and instructed counsel to withdraw. Trial counsel, however, did not withdraw from representation. The petitioner said that there was "[n]o way possible" that trial counsel met with him 22 times as reflected in counsel's time logs. The petitioner claimed they had only met five or six times. At their last meeting before trial, when the petitioner again expressed his dissatisfaction with counsel, he claimed that trial counsel "would look at [him] like . . . [he] wouldn't understand [the issues of the case], you know basically, like [he was] ignorant."

The petitioner testified that trial counsel did not discuss Doctor Auble's report with him before trial. He said that had they discussed the report, he would have noticed Doctor Auble's statement that the petitioner told her that Ms. Hoffman had pulled the gun. The petitioner said that this was just a mistake and that it could have been corrected prior to anyone testifying had trial counsel discussed the report with him.

The petitioner said that he never wanted to testify and that trial counsel did nothing to prepare him to testify. He recalled that after Doctor Auble's testimony was excluded, he told trial counsel that he did not want to testify and that trial counsel told him

that he would be "automatically . . . found guilty" if he did not testify.

Concerning the shock belt, the petitioner testified that he did not want to "dress out" on the morning of trial because he wanted to inform the judge about the broken relationship with trial counsel. An officer whom he had never met came into the holding cell and placed the shock belt on his inner left thigh and said that "they didn't want no disruptions out of me." The petitioner said that he never "acted up" in court and had only stated his complaints concerning trial counsel to the judge. The petitioner said that the shock belt remained on his thigh throughout the trial and was only removed after he testified.

On cross-examination, the petitioner admitted that he was testifying only from his memory and that he had kept no notes of meetings with his defense team. He said that he was unaware trial counsel had documented their meetings in time logs. He conceded that Ms. Hoffman's father may have "perceived" some of the petitioner's eye contact or actions in court as "antagonizing." He also acknowledged that the State did not attempt to refute any evidence presented that Mr. Nance was the petitioner's drug dealer and that the petitioner carried a gun because he had been recently robbed.

Kevin Hoffman, the victim's father, testified in rebuttal for the State that the petitioner "acted out" and was disrespectful in court. He recalled one instance when he "blew the [petitioner] a kiss" when the petitioner tried to antagonize him during the trial.

Following the evidentiary hearing but prior to the post-conviction court's ruling, the parties stipulated to the affidavit of KCSO Officer Tylenia Miller, a court offficer present in the trial court during the petitioner's trial. Ms. Miller confirmed that a shock belt had indeed been placed on the petitioner's thigh throughout trial. The post-conviction court stated that it had considered Ms. Miller's affidavit in its findings and conclusions.

The post-conviction court denied the petitioner's requested relief. The court accredited the testimony of trial counsel concerning his meetings with the petitioner and the pretrial preparation. The court also found that the use of the shock belt did not violate the petitioner's right to a fair trial because the shock belt was not visible to the jury and its use was reasonable in light of the petitioner's recalcitrant behavior in court. The court denied all of the petitioner's allegations of ineffective assistance of counsel, ruling that trial counsel did not perform deficiently. Specifically concerning Doctor Auble's testimony, the post-conviction court ruled that trial counsel acted reasonably in his handling of Doctor Auble's testimony in consideration of the trial court's initial ruling.

The petitioner filed a timely notice of appeal from the post-conviction court's denial of relief. On appeal, the petitioner claims entitlement to post-conviction relief on the

basis of counsel's numerous instances of deficient and prejudicial performance, the trial court's use of the shock belt, the State's failure to disclose the threat of prosecution made to Tabitha Robinson, the constitutional error attendant to the juvenile court transfer hearing based upon judicial fact-finding, and the destruction of jail records which, he claims, deprived him of a full and fair hearing. The State responds that the petitioner failed to prove any allegations of ineffective assistance of counsel by clear and convincing evidence and that all of the remaining allegations are waived due to the petitioner's failure to raise them at a previous hearing. In response to the waiver argument, the petitioner asks this court to review those allegations via a claim of ineffective assistance of counsel.

*General Principles of Law*

*Post-Conviction Proceedings*

We view each of the petitioner's claims with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40–30–103 (2006). A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. *Id.* § 40–30–110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578–79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

*Ineffective Assistance of Counsel*

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington,* 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State,* 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland,* 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt,* 54 S.W.3d 762, 766–67 (Tenn. 2001); *State v. Burns,* 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields,* 40 S.W.3d at 457–58; *see also State v. England,* 19 S.W.3d 762, 766 (Tenn. 2000).

The petitioner contends that his convictions are the product of trial counsel's ineffective assistance. Specifically, he argues that trial counsel failed to effectively communicate with him throughout the representation, both pretrial and during trial. He contends that trial counsel failed to develop an effective theory of defense by not preparing him to testify at trial, by not arguing successfully the admissibility of Doctor Auble's testimony, by calling Doctor Auble as a witness following the petitioner's testimony, and by failing to ask Doctor Auble whether the petitioner's mental state precluded him from forming the requisite mens rea for the offenses. The petitioner also argues that trial counsel was ineffective by failing to present lay witnesses at trial to testify concerning his mental state at the time of the offenses, by consenting to the trial court's use of the shock belt, and by not withdrawing from representation when the petitioner requested that counsel do so. On appeal, the State argues that the record supports the post-conviction court's findings and conclusions of law.

From our review of the record, we determine that the post-conviction court correctly ruled that the petitioner failed to establish all of his claims of ineffective assistance of counsel except those related to counsel's handling of Doctor Auble's testimony. Save that allegation, we would agree that the petitioner failed to establish by clear and convincing evidence that trial counsel did not maintain effective communication with the petitioner, failed to present lay witnesses at trial, prejudicially consented to the use of the shock belt, or deficiently ignored the petitioner's requests to withdraw from representation. As we will explain, however, we determine that the petitioner did show by clear and convincing evidence that trial counsel's representation surrounding Doctor Auble's testimony fell below a reasonable standard of performance to the prejudice of the petitioner's case.

-11-

*I. The Use of Expert Testimony*

In *State v. Phipps*, 883 S.W.2d 138 (Tenn. Crim. App. 1994), this court permitted the introduction of evidence regarding the defendant's mental condition for the purposes of negating the requisite mental state for the offense charged. *Phipps,* 883 S.W.2d at 149. As our supreme court later discussed in *Hall*, the use of such evidence is not a defense to a crime, but is "'merely a rule of evidence'" allowing proof of the defendant's mental condition to negate the requisite culpable mental state. *Hall*, 958 S.W.2d at 688-89 (quoting *United States v. Pohlot*, 827 F.2d 889, 897 (3rd Cir. 1987)); *see also Phipps*, 883 S.W.2d at 143. As reiterated by our supreme court in *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005), "'psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.'" *Faulkner*, 154 S.W.3d at 56-57 (quoting *Hall*, 958 S.W.2d at 689-90). Indeed, this court relied upon these propositions of law in ruling on direct appeal in this case that the trial court's initial exclusion of Doctor Auble's entire testimony was erroneous. *See Brandon Mobley*, slip op. at 14.

Regarding the presentation of Doctor Auble's testimony, trial counsel testified at the post-conviction evidentiary hearing that Doctor Auble's evaluation and report included a detailed account of the petitioner's background and mental health history. Doctor Auble, through her evaluation, had also concluded that the petitioner was unable to form the requisite mens rea for the charged offenses due to his suffering from major depression. To that end, trial counsel determined that her testimony would be the most valuable and effective way to both convey the petitioner's account of the offenses to the jury and to present evidence showing the defendant's inability to form the requisite mens rea. Trial counsel testified that he was "taken aback" by the State's objection to the testimony and the trial court's initial agreement with the State to exclude the testimony. He recalled that discussions with the trial court concerning the holding in *Hall* were futile because trial counsel's argument "didn't seem to make any difference" to the trial court.

Trial counsel recalled that once the petitioner testified, the State withdrew the objection to Doctor Auble's testimony, presumably because of the discrepancy between the petitioner's testimony and his account of the offenses contained in Doctor Auble's report. Trial counsel nevertheless called Doctor Auble to testify to present the evidence negating mens rea. Trial counsel testified that Doctor Auble "ultimately was able to testify" about the petitioner's ability to form mens rea. Trial counsel recalled asking Doctor Auble whether the petitioner was capable of premeditating due to his mental health at the time of the offenses.

The trial record, however, contradicts counsel's recollection of Doctor Auble's testimony. In fact, the transcript of the argument surrounding the trial court's initial

-12-

exclusion of the testimony reveals that trial counsel stated

> I'm not going to ask [Doctor Auble] to state to this jury that
> anyone is . . . incapable of premeditation. What his mental state
> was at the time . . . is relevant. . . . I do not intend to have
> [Doctor Auble] give an opinion on that ultimate issue.

The trial court then incorrectly ruled that any testimony concerning the petitioner's ability to form intent would "invade the province of the jury." *See Brandon Mobley*, slip. op. at 14 (ruling that trial court improperly excluded Doctor Auble's testimony that petitioner's suffering from major depression prevented him from premeditating the shooting); *see also Faulkner*, 154 S.W.3d at 56-57; *Hall*, 958 S.W.2d at 689-90.

Following the petitioner's testimony at trial, the State withdrew its objection to Doctor's Auble's testimony, subject to her not testifying about the petitioner's ability to premeditate, and the trial court permitted her testimony with the limitation that Doctor Auble not testify concerning the petitioner's ability to premeditate. During direct examination, Doctor Auble testified extensively regarding the petitioner's social background, childhood, and mental health history. When asked by trial counsel whether Doctor Auble had "an opinion as to how his mental state would have been affected by what he perceived as threats," Doctor Auble replied generally that the petitioner is "someone who's impulsive, who reacts, who doesn't think . . . he responded [on the day of the offenses] without thinking through what he was doing." At no time during Doctor Auble's testimony did trial counsel specifically ask whether the petitioner's mental health precluded him from forming the premeditation required to commit the offenses. As such, Doctor Auble did not testify that the petitioner's mental state on the date of the offenses prevented him from premeditating the shootings, despite having opined as much in her report.

We note that on direct appeal this court ruled that the trial court's erroneous initial ruling was rendered harmless because Doctor Auble did eventually testify at trial. *See Brandon Mobley*, slip op. at 14. For this reason, we have considered whether the law of the case doctrine precludes our finding prejudice in the context of ineffective assistance of counsel flowing from counsel's deficient performance concerning the presentation of Doctor Auble's testimony. Our supreme court addressed the law of the case doctrine in great detail in *Memphis Publishing Company v. Tennessee Petroleum Underground Storage Tank Board*, 975 S.W.2d 303 (Tenn. 1998), and it stated:

> The phrase "law of the case" refers to a legal doctrine
> which generally prohibits reconsideration of issues that have
> already been decided in a prior appeal of the same case. In other

-13-

words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.

The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.* at 306 (citations omitted).

On direct appeal this court reviewed the propriety of the initial exclusion in toto of Doctor Auble's testimony only, and counsel did not raise any allegation of error concerning the subsequent limitation of testimony that occurred once the State withdrew the objection to her testifying. Thus, the issue presented in the post-conviction action did not

"appl[y] to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication." *Id*. Accordingly, we conclude that the law of the case does not preclude our finding prejudice from counsel's deficient performance. Therefore, we are able to assess fully the petitioner's ineffective assistance of counsel claim.

Turning to trial counsel's performance surrounding Doctor Auble's testimony, trial counsel stated during initial discussions of the admissibility of her testimony that he "did not intend to have [Doctor Auble] give an opinion on that ultimate issue." Furthermore, the record reveals that when the State withdrew the objection to Doctor Auble's testifying, the State asked the trial court "to instruct [trial counsel] not to ask the ultimate question" concerning the petitioner's ability to premeditate. Trial counsel sat silently and raised no objection as the trial court ruled that Doctor Auble could not be asked whether the petitioner could form the requisite intent. At no time during Doctor Auble's testimony did trial counsel specifically ask whether the petitioner's mental health precluded him from forming the required intent to commit the offenses. Under these circumstances, we conclude that the errors of counsel in arguing the issue at both the trial court and appellate court levels, in conjunction with trial counsel's failure to inquire or even understand his duty to inquire about the petitioner's ability to premeditate, amounted to deficient performance. When viewed in the context of counsel's deficient performance, we further conclude that there is a reasonable probability that had trial counsel not committed these errors, the result of the proceeding would have been different. Accordingly, the petitioner is entitled to relief based upon his allegation of ineffective assistance of counsel stemming from trial counsel's preparation, presentation, and argument concerning Doctor Auble's testimony.

## II. Use of a Shock Belt

The petitioner claims that the trial court's failure to conduct a hearing concerning the placement of a shock belt on him during trial violated his right to due process. The State contends that this allegation is waived because the petitioner failed to present it at trial or on direct appeal. Furthermore, the State argues that the petitioner has failed to show any prejudice stemming from the use of the shock belt.

We agree with the State that any free-standing claim concerning the shock belt is waived because it was not presented to the trial court or on direct appeal. *See* T.C.A. § 40-30-106(g). Accordingly, we will address this allegation only via the petitioner's ineffective assistance claim with the previously mentioned applicable principles in mind.

The concept of due process imbedded in our state and federal constitutions guarantees every criminal defendant a fair and impartial trial. Included in the presumption of innocence is the defendant's right to the "physical indicia of innocence." *Willocks v.*

*State*, 546 S.W.2d 819, 820 (Tenn. Crim. App. 1976) (citing *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973), *cert. denied sub nom. Kennedy v. Gray*, 416 U.S. 959 (1974)). The rule that a prisoner brought into court for trial is entitled to appear free from all bonds or shackles is an important component of a fair and impartial trial, and shackles should never be permitted except to prevent the escape of the accused, to protect everyone in the courtroom, or to maintain order during trial. *Kennedy*, 487 F.2d at 105 (citing *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970)). In holding that in-court shackling is inherently prejudicial, this court has agreed that "there should be a legal presumption against the necessity of in-court restraint, with the burden falling on the state 'to show the necessity of any extreme physical measures .'" *Willocks*, 546 S.W.2d at 821 (quoting *Kennedy*, 487 F.2d at 107).

Although Tennessee courts have not addressed the specific use of shock belts to restrain a defendant at trial, the federal courts of appeals have noted that the fundamental issues implicated by the use of shock belts are essentially the same as those involved in shackling. *See*, *e.g.*, *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) (noting that "stun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways."). Focusing specifically on the use of shock belts, at least one federal court of appeals has ruled that the impact on fundamental rights attendant to their use is more significant and includes the defendant's right to participate in his own defense. *See Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003).

Later, in *Deck v. Missouri*, the Supreme Court prohibited the use of shackles absent an essential state interest. *Deck v. Missouri*, 544 U.S. 622, 623 (2005). The Court, concluded, however, that the petitioner must show that he was prejudiced in some way by the trial court's action in order to establish a due process violation. *Deck*, 544 U.S. at 636. Our own supreme court has noted that

> [g]enerally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve [the] primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshaling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried.

*State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986).

In the present case, the petitioner does not allege that he was prejudiced by the jury's viewing of the shock restraint. Rather, he alleges that the trial court's failure to

conduct any hearing concerning the propriety of the restraint and trial counsel's consent to the restraint despite the petitioner's opposition violated his due process rights at trial. Citing *Gonzalez v. Pliler,* he further argues that the presence of the shock belt served to inhibit his testimony at trial, thereby denying him his right to a fair trial.

The record reflects that the petitioner refused to "dress out" on the morning of the first day of his trial because of his dissatisfaction with trial counsel's preparation and in furtherance of his desire to voice opposition to counsel's continued representation. Consequently, the trial court allowed the petitioner to state his complaints concerning counsel. Following the petitioner's statements, the trial court then, sua sponte, questioned the defense investigator concerning the attorney-client relationship. The trial court ruled that there was "no disintegration of communication between the [petitioner] and the attorney" and denied the petitioner's request to remove counsel.

What appears on the record next is an informal discussion between the trial court and the attorneys concerning whether the petitioner should be tried in absentia or be forced to "dress out." Apparent from this discussion is the trial court's characterization of the petitioner's refusal to "dress out" as an "attempt on [the petitioner's] part to disturb the proceedings of [the] court." At the conclusion of the trial court's admonishment to the petitioner, the court advised the petitioner that he could either "dress out" for trial or remove himself from participation in the trial by spending the duration of the trial in his jail cell. Through counsel, the petitioner initially indicated that he had elected to remain in his jail cell and not participate in the trial. Based upon concerns in trying the petitioner in absentia, the prosecutor remarked, "I think the more we can do to force him to sit in the courtroom and listen to his trial the better off we all are." During a bench conference that included a court officer, the following discussion occurred:

> COURT OFFICER: Of course, he'll probably come out here. If I tell him he needs to come out here to put this stuff on the record, he'll come out for that because that's how I got him the last time, telling him that if he was going to try to fire his attorney it had to be on the record, and he was agreeable to that. But then once it reaches the other point, he's just going to turn and walk out, I'm afraid. Okay? Now my suggestion is that we can put the shock belt on him, and then that way he'll know if he starts acting up –
> THE COURT: That's all right.
> [TRIAL COUNSEL]: That's not a bad idea, I mean, at this point.

-17-

Following further discussions, the trial court questioned the petitioner regarding his desire to be tried in absentia. The following exchange took place:

> THE COURT: . . . And I want to ask you sincerely, do you feel that you could allow the trial to go forward without your presence?
> [THE PETITIONER]: No, sir. That's why I'm ready to get my – my street clothes on –
> THE COURT: All right.
> [THE PETITIONER]: – get these cuffs and everything on and get this thing on the road –
> THE COURT: All right. That's fine.
> [THE PETITIONER]: – before we waste any more of the Court's time.
> THE COURT: Okay. All right. . . . you understand what I said earlier about any probable or possible disturbance in the courtroom –
> [THE PETITIONER]: Yes, sir. I do.

At the post-conviction evidentiary hearing, the petitioner testified that the presence of the shock belt affected his testimony at trial. He failed to specify, however, in what way his testimony would have been different had the shock belt not been implemented. The post-conviction court ruled that the use of the shock belt was appropriate in light of the petitioner's recalcitrance on the morning of trial and that trial counsel did not perform deficiently. The record, however, belies this conclusion and establishes instead that the trial court failed to establish any "'necessity of any extreme physical measures.'" *See Willocks*, 546 S.W.2d at 821 (quoting *Kennedy*, 487 F.2d at 107). Moreover, the record supports a conclusion that trial counsel performed deficiently by not only agreeing to the use of the shock belt but also actively suggesting its use despite no showing of necessity. Because the evidence presented at the evidentiary hearing failed to show any prejudice stemming from the use of the shock belt or from trial counsel's representation concerning its use, however, we conclude that the petitioner failed to prove that counsel was ineffective relative to this issue.

### III. Momon Error

The petitioner next is aggrieved of the trial court's failure to make the necessary inquiries under *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), regarding the petitioner's waiver of his right to testify at trial. The State contends that the trial court's failure to conduct an adequate *Momon* hearing is waived because the petitioner failed to

-18-

present it at trial or on direct appeal. The petitioner also claims that counsel rendered ineffective assistance by failing to ensure that the trial court conducted an adequate *Momon* hearing. The State asserts that the petitioner is not entitled to relief because the record sufficiently establishes that the petitioner personally chose to testify.

We agree with the State that any free-standing claim under *Momon* is waived because it was not presented to the trial court or on direct appeal. *See* T.C.A. § 40-30-106(g). Accordingly, we will address only the petitioner's ineffective assistance claim with the previously mentioned principles applicable to ineffective assistance of counsel claims in mind.

In *Momon,* our supreme court held that "a criminal defendant's right to testify is a fundamental constitutional right guaranteed both by [a]rticle I, section 9 of the Tennessee Constitution and by the Fifth and Fourteenth Amendments to the United States Constitution. As such, the right must be personally waived by the criminal defendant." *Momon*, at 161. The court then established a "prophylactic" procedure "to ensure that defense attorneys in future criminal cases do not unilaterally deprive criminal defendants of the fundamental right to testify." *Id.* at 162. The court described the procedure to be followed in all cases where the accused does not testify:

> At any time before conclusion of the proof, defense counsel shall request a hearing, out of the presence of the jury, to inquire of the defendant whether the defendant has made a knowing, voluntary, and intelligent waiver of the right to testify. This hearing shall be placed on the record and shall be in the presence of the trial judge. Defense counsel is not required to engage in any particular litany, but counsel must show at a minimum that the defendant knows and understands that:
>
> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

(3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id.* The court noted that the colloquy should generally be conducted by trial counsel and that "[u]nder normal circumstances . . . the trial judge should play no role in this procedure." *Id.* Although the *Momon* court addressed these concerns in the context of ensuring that a defendant who ultimately chooses not to testify is adequately advised concerning his rights, we can see no reason why the *Momon* principles and procedures would not apply even though the defendant opted to testify, as did the petitioner in this case. Even though the petitioner in this case did testify, we will examine his allegation filtered through his claim of ineffective assistance of counsel.

In this case, the following colloquy occurred following the trial court's initial exclusion of Doctor Auble's expert testimony:

[TRIAL COUNSEL]: We will call the [petitioner].

THE COURT: Okay. And we might as well go through a *Momon* hearing now. Have you discussed this case with the [petitioner], and he knows that he does not have to testify if he doesn't want to. Have you explained that to him?

[TRIAL COUNSEL]: I have, Your Honor.

THE COURT: And you see this *Momon* case is a little strange because the Court cannot talk to the defendant directly because there is some possibility of influence. All right. He – understands that?

[TRIAL COUNSEL]: He does, Judge.

THE COURT: And that if he wants to, no one can keep him from testifying; or if he doesn't want to, no one can force him to testify. You understand that?

[TRIAL COUNSEL]: Are you – are you asking him?

THE COURT: No, I'm asking you.

[TRIAL COUNSEL]: Judge, he does understand that.

THE COURT: And I think the Supreme Court short-circuited the trial courts, and he – he does this on his own free will?

[TRIAL COUNSEL]: We've discussed it at length, Judge, and he understands it.

THE COURT: All right. All right. As long as he understands.

This exchange clearly falls short of the *Momon* requirements because the petitioner was not advised on the record by trial counsel concerning any of the specific rights attendant to his decision to testify, and more importantly, the record is devoid of any evidence that the petitioner personally chose to testify. Although the trial court stated that no one could force the petitioner to testify or not to testify, at no time during the colloquy was the petitioner personally addressed by counsel as contemplated by *Momon*. Likewise, the petitioner never stated anything on the record regarding his decision to testify. In summary, the procedure employed in this case did not fulfill any of the requirements of *Momon* to ensure that the petitioner made an informed decision concerning testifying.

Turning now to the issue of how this failure relates to the petitioner's allegation of ineffective assistance, the petitioner testified at the evidentiary hearing that had he been properly admonished concerning his right to testify he would have chosen not to testify. He also said that he never intended to testify because he was not prepared and had "no real understanding" of what to expect at trial. The petitioner recalled that he told trial counsel that he did not want to testify, but counsel told him that he would "automatically be found guilty" if he did not testify. He said that he did not know about the inconsistency in Doctor Auble's report concerning who pulled a gun because trial counsel did not review the report with him prior to trial or prior to his testimony. He testified that he would have made sure the report was corrected had he known about the discrepancy.

Trial counsel testified that after Doctor Auble's testimony was excluded by the trial court, he felt that the only way to convey the petitioner's version of events to the jury would be for the petitioner to testify. Counsel could not recall the trial court's conducting the *Momon* colloquy and speaking only to counsel, not to the petitioner. Both the petitioner and trial counsel agreed, and the trial record reflects, that the brief discussion concerning the petitioner's testifying occurred at counsel table and without the trial court's taking a recess.

The post-conviction court did not make any findings specific to the petitioner's *Momon* allegation. Instead, the court generally ruled that the petitioner did not suffer from any deficient performance via trial counsel's preparation of the petitioner to testify. Clearly,

-21-

however, counsel's performance was deficient in regard to the *Momon* issue. Counsel failed to object to the way in which the trial court conducted the hearing, and he failed to elicit from the petitioner on the record a statement that the petitioner had made a personal and voluntary decision to testify. The uncontroverted testimony of the petitioner establishes that the petitioner did not want to testify and had not been prepared by trial counsel to take the stand. The record establishes, via the testimony of both the petitioner and trial counsel, that the petitioner only testified after the trial court erroneously excluded Doctor Auble's testimony. In our view, trial counsel's inadequate handling of Doctor Auble's testimony and his failure to protect the petitioner's rights via a properly conducted *Momon* hearing led to the petitioner's testifying against his will.

That being said, the petitioner has failed to establish that he was prejudiced by counsel's deficient performance. The petitioner's testimony was consistent with the version of the facts he reported to friends on the day of the murder and, with only one minor discrepancy, was consistent with the version of events he provided to Doctor Auble. Because he has failed to establish prejudice, he is not entitled to relief on this issue.

*IV. Threat of Prosecution to State Witness*

The petitioner argues that his due process rights were violated by the State's failure to disclose the threat of prosecution of Tabitha Robinson made to her sister, Jada Byrge, in exchange for Ms. Byrge's testimony at trial. The State contends that the petitioner has failed to show that he is entitled to relief.

"Evidence favorable to an accused includes that which may be used to impeach the prosecution's witnesses." *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). To be sure, if a witness has received or been promised government-supplied benefits or some favorable consideration in exchange for testifying against a defendant, that information is exculpatory in its tendency to impeach the witness' credibility and motive for testifying. *Giglio,* 405 U.S. at 154-155; *Hartman v. State,* 896 S.W.2d 94, 101 (Tenn. 1995). Likewise, evidence that a witness has testified under threat of prosecution of herself or a third party may also be exculpatory when used as impeachment.

Ms. Byrge testified at the evidentiary hearing that she was reluctant to testify. She recalled a conversation between herself and the prosecutor during which the prosecutor indicated that Tabitha Robinson, Ms. Byrge's 11-year-old sister, could be charged as an accessory after the fact for her assistance to the petitioner in cleaning blood and brain matter from Ms. Hoffman's vehicle. Despite Ms. Bryge's feeling threatened by the prosecutor's

statements, she testified at the evidentiary hearing that she was truthful in her statements to the police and in her testimony at the petitioner's trial. Ms. Byrge indicated that she was also reluctant to testify at trial because she felt threatened by the petitioner's siblings. She stated that she ultimately testified because her mother told her "it was the right thing" to do.

In our view, the prosecutor's statement to Ms. Byrge qualifies as impeachment evidence that was not disclosed to the petitioner at trial. However, we discern no prejudice stemming from the failure to disclose given Ms. Byrge's overall equivocal feelings concerning her testimony which were driven by multiple influences, including the petitioner's siblings. Furthermore, Ms. Byrge's testimony that she testified truthfully undercuts any prejudice that might have stemmed from the State's failure to disclose the prosecutor's statement.

## V. Constitutionality of Juvenile Transfer Hearing

The petitioner argues that the procedure employed for transferring a case from juvenile court to adult court violates the principles of *Apprendi* and its progeny, by permitting his transfer from juvenile court to adult court based upon judicially-determined facts. The State contends that any issue concerning the constitutionality of the juvenile court transfer hearing is waived because the petitioner failed to present it at trial or on direct appeal.

We agree with the State that any free-standing claim concerning the juvenile court transfer procedure is waived because it was not presented to the trial court or on direct appeal. *See* T.C.A. § 40-30-106(g). Accordingly, we will address only the petitioner's ineffective assistance claim with the previously mentioned principles applicable to ineffective assistance of counsel claims in mind.

In assessing whether trial counsel's failure to raise an *Apprendi* challenge to the petitioner's juvenile court transfer proceedings amounts to ineffective assistance of counsel, we note that counsel clearly could have mounted a challenge to the juvenile court transfer procedure on the basis of *Apprendi* at the time of the petitioner's transfer to adult court in 2004. That being said, we also acknowledge that Tennessee courts have not addressed the application of *Apprendi* to juvenile court transfer proceedings. Other jurisdictions, however, have addressed *Apprendi*'s applicability with conflicting results but with the majority of jurisdictions concluding that the judicial fact-finding attendant to juvenile court transfer proceedings does not violate a defendant's rights. *See Gonzales v. Tafoya*, 515 F.3d 1097, 1110-13 (10th Cir. 2008) (detailing other jurisdictions' analyses of *Apprendi*'s applicability to juvenile court transfer proceedings). As such, we cannot conclude that counsel was ineffective in failing to raise this claim at the trial or on direct appeal.

*VI. Destruction of Jail Records*

The petitioner also argues that he was denied his right to a full and fair evidentiary hearing by the KCSO's destruction of jail visitation logs. The State argues that there is no duty to preserve evidence for use in collateral proceedings.

The petitioner relies upon *State v. Ferguson,* 2 S.W.3d 912 (Tenn. 1999). In *Ferguson,* officers videotaped the defendant's performance on field sobriety tests administered as part of a driving under the influence investigation; however, the taped tests were inadvertently "taped over" before they were viewed by anyone. *Id.* at 914-15. Our supreme court determined that, for purposes of applying the Tennessee Constitution's "law of the land" clause to issues of the State's losing, damaging, or destroying potentially exculpatory evidence, a balancing test should be utilized. First, as a threshold, the court should "determine whether the State had a duty to preserve the evidence." *Id.* at 916. If the State failed to discharge a duty to preserve evidence, the court then determines

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.* at 917.

Our courts have not extended the application of *Ferguson* to post-conviction proceedings. That being said, we also acknowledge *Ferguson's* holding that "[g]enerally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn[essee] R [ule] Crim[inal] P[rocedure] 16, or other applicable law," *Ferguson*, 2 S.W.3d at 917, and that Tennessee Supreme Court Rule 28 section 6(C)(7) provides for discovery in post-conviction proceedings "of all those items deemed discoverable under Rule 16 [of the] Tennessee Rules of Criminal Procedure."

In this case, the petitioner filed a subpoena duces tecum in July 2009 requesting copies of all relevant jail visitation logs concerning meetings between trial counsel and the

petitioner. Assistant Chief Hayes testified that the logs were destroyed per normal sheriff's department operating procedures in September 2009. He further testified that he was unaware of the subpoena requesting the records. Notably, Assistant Chief Hayes stated that the records should have been destroyed within three years of their making, sometime in 2007 to 2008 as relevant to the petitioner, but that there had been a delay in destroying some of the records.

Even assuming the extension of *Ferguson* to post-conviction proceedings and the State's duty to preserve these records, we cannot conclude that the destruction of the records by an act of simple negligence, as indicated by Assistant Chief Hayes' ignorance of the subpoena, resulted in a denial of the petitioner's right to a full and fair hearing. Trial counsel's detailed time logs were admitted at the evidentiary hearing in support of testimony that he met with the petitioner approximately 20 times in preparation for trial. The post-conviction court accredited counsel's testimony regarding these meetings. Under these circumstances, we cannot conclude that the petitioner was denied a full and fair hearing.

## VII. Cumulative Effect of Errors

Having considered each of the petitioner's allegations for post-conviction relief and concluded that counsel's deficient representation concerning the admission of expert testimony of the petitioner's inability to form the requisite mens rea resulted in prejudice that merits granting post-conviction relief, we need not consider the cumulative effect of the errors.

## CONCLUSION

We conclude that the petitioner established by clear and convincing evidence that trial counsel performed deficiently concerning the use of expert testimony at the petitioner's trial. Furthermore, we conclude that there exists a reasonable probability of a different result at trial had counsel not performed deficiently. Accordingly, the judgment of the post-conviction court denying relief is reversed. On remand, the post-conviction court is directed to grant the petitioner a new trial.

_____
JAMES CURWOOD WITT, JR., JUDGE

-25-